HEALY, APPELLANT, v. FIRST NATIONAL BANK OF GREAT FALLS, RESPONDENT.

(No. 7,873.)

(Submitted March 16, 1939. Decided April 12, 1939.)

[89 Pac. (2d) 555.]

*Mr. H. Norskog,* for Appellant, submitted an original and a supplemental brief, and argued the cause orally.

*Messrs. R. H. Glover, S. B. Chase, Jr.,* and *John D. Stephenson,* for Respondent, submitted a brief; *Mr. Stephenson* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was by agreement tried to the court without a jury. The court found for defendant, and plaintiff appealed from the judgment.

The complaint sets forth that plaintiff, a customer of defendant bank, on April 15, 1935, negotiated a loan from defendant in the sum of $1,400, the same to be placed to his credit in his account with the defendant bank; that he gave a note to defendant in that amount and deposited as security 200 shares of the capital stock of the Consolidated Oil Company, and agreed to deposit 200 additional shares of the same company which plaintiff was purchasing; that the 400 shares were to be held by defendant until plaintiff paid the note; that on April 3, 1935, plaintiff had ordered through the brokerage firm of McLeish Securities Corporation in Great Falls 200 shares of the common stock of the Consolidated Oil Company at $6.87½ per share; that on April 15 plaintiff learned that his order had been executed and gave a written order to the McLeish Securities Corporation to deliver the stock to defendant, and upon such delivery, and not otherwise, ordered defendant to pay to the Securities Corporation, from the funds of plaintiff then on deposit and to his credit, the sum of $1,402.80, the purchase price of the stock with brokerage charges; that on April 15 the Securities Corporation presented the order to defendant, and defendant thereupon paid the sum of $1,402.80 to the Securities Corporation and charged it to plaintiff's account, but, disregarding the order, failed to secure from the Securities Corporation the shares of stock in question, to plaintiff's damage in the sum of $1,800; that on August 7, 1935, plaintiff paid de-

fendant the total amount due on the note and received from the bank the 200 shares of stock deposited as security, and demanded surrender of the other 200 shares, which defendant refused; that the 200 shares were worth on August 7 the sum of $9 per share; that on July 9, 1935, the Securities Corporation became insolvent; and that the receiver who was duly appointed for the insolvent corporation paid to plaintiff $659.26 by agreement with defendant that the same could be applied on any indebtedness, if any, owing by defendant to plaintiff, and without affecting plaintiff's right to collect the balance.

The answer admits that plaintiff signed the note and paid it. It sets out that the understanding arrived at between plaintiff and defendant on April 15, 1935, was as follows: That plaintiff requested a loan of $1,400 for the purpose of paying the Securities Corporation the purchase price of the 200 shares of Consolidated Oil Company stock, which plaintiff had purchased through the Securities Corporation; that at that time plaintiff informed defendant that the Securities Corporation would not order out the stock until the Securities Corporation had been paid the purchase price in cash; that thereupon it was agreed that plaintiff would give his note for $1,400 and deliver the 200 shares of stock then in his possession as collateral, and that plaintiff would ascertain the amount due to the Securities Corporation for the other 200 shares of stock purchased by him, and would give to the Securities Corporation instructions to turn over to defendant the 200 shares when received by the Securities Corporation, and that when defendant learned the amount due to the Securities Corporation from plaintiff, it would turn the same over to the Securities Corporation, and that pursuant to the agreement defendant did on April 15, 1935, after securing the order left by plaintiff with the Securities Corporation, pay to it the purchase price of the stock in the sum of $1,402.80, charged it to plaintiff's account, and has never received the shares of stock. The reply was a general denial of the new matter in the answer.

The point at issue between the parties is whether the bank was authorized to pay the $1,402.80 to the Securities Corpora-

184

tion before receiving the shares of stock. The evidence bearing upon this disputed point from plaintiff's standpoint is that he ordered the stock from the Securities Corporation on April 3, 1935. On April 15 he received word through the mail that the stock had been purchased. He went to the office of the Securities Corporation to complete the transaction. From there he went to the bank to make arrangements for the necessary money. His dealings were with Mr. Curry, the cashier of the bank. His proposal to Curry was that he would put up as collateral 400 shares of the Consolidated Oil stock for a loan of $1,400; that this sum was needed and desired by him to pay for 200 shares of the stock which he had just purchased through an agent, the McLeish Securities Corporation, selected by him. Had he obtained the money he would have paid it to the Securities Corporation for the stock. He also asked credit for an additional $1,000 which had previously been arranged for. The bank teller prepared the credit of $2,400 for plaintiff, which was given to him by the note clerk, but as he was about to leave the bank, Curry called him back and advised him that the bank would give plaintiff credit for only the $1,000 at that time. The credit slip for $2,400 was recalled and changed accordingly to $1,000. Plaintiff said that Curry then told him that the additional $1,400 credit would be given when the shares came in from McLeish's office. Plaintiff then went to the Securities Corporation office and said to McLeish, ''That is all right now, you can deliver those shares to the bank.'' On the second trip to the Securities Corporation office, plaintiff was told by McLeish that the 200 shares of stock he had ordered would have to be paid for before they could be ''ordered out.'' The stock had advanced in price $1.50 per share, and plaintiff thereupon told McLeish that he would close out the stock and take his profit. It was later discovered that McLeish had already sold the stock and taken the profits for himself. McLeish thereupon asked plaintiff whom he talked with at the bank. Upon being told it was Curry, McLeish asked plaintiff if he had any objection to McLeish talking to Curry over the telephone, and upon being told that he had no objection, Mc-

Leish did so. MeLeish then asked plaintiff to give him an order to deliver the 200 shares of stock to the bank. This he did by a writing signed by him and addressed to McLeish Securities Corporation in the following form: "I hereby authorize you to deliver 200 shares Consolidated Oil to the First National Bank, Great Falls, Montana, in consideration of their payment to you of $1,402.80." Plaintiff then returned to his home.

McLeish, through his stenographer, on the same day presented the order to the bank and the bank paid the $1,402.80 to McLeish's stenographer out of the plaintiff's account and took a receipt for it. The bank also credited the account of plaintiff with $1,400; it did not receive the stock then or since. On May 20, 1935, the Securities Corporation, being insolvent, ceased to do business. On May 10, 1935, plaintiff met Curry on the street and talked about the sale of the stock, but Curry did not tell him the stock had not been delivered to the bank. Plaintiff knew that the bank paid the money to McLeish when he received his bank statement for the month of April, 1935. By letter of May 20 the bank notified plaintiff for the first time that the stock had never been delivered. Plaintiff paid his obligation to the bank on August 7, 1935. The market value of the stock at that time was $9 per share.

The bank's version of the transaction, testified to by Curry, was that there was no statement made to plaintiff that "when the shares from McLeish would come in, I would give him the $1,400 credit. I made no direct statement, except that we were to pay McLeish right now. The whole thing was, we were to pay McLeish and subsequently receive the shares of stock direct from McLeish. That's the only way it could have been."

Plaintiff contends that by virtue of the agreement the bank became a trustee empowered to deliver the money only upon receipt of the 200 shares of stock. If the agreement was as contended for by plaintiff, there would be merit in his contention. However, there was a conflict in the evidence as to the terms of the agreement. The court accepted defendant's version of the nature and terms of the agreement. There being substantial evidence supporting the court's conclusion, under

well-settled principles we will not interfere with the court's determination.

The written order is not definite as to whether the payment of the money and the delivery of the stock were to be contemporaneous in point of time, and the oral evidence bearing upon the agreement between plaintiff and the bank being conflicting, we must accept that supporting the court's judgment.

Plaintiff argues with some degree of plausibility that if the understanding was as contended by defendant, the transaction would have been handled in a different manner. Defendant, on the other hand, argues with the same emphasis that if the understanding was as plaintiff contends, the order directed to the Securities Corporation would have so stated in so many words. We think there was sufficient evidence to warrant a finding either way. We cannot say that the court's judgment is not supported by some substantial and reasonable evidence consistent with stock purchasing transactions.

In support of the contention made by the bank in regard to the agreement or understanding, and to refute plaintiff's version of the terms of the agreement, the bank introduced testimony as to certain customs of the brokerage business. The plaintiff objected to this testimony and assigns its admission as error. The custom shown was that before stock is ordered out by the broker, it must be paid for and, as some time must elapse between the payment for and the delivery of the stock, it would have been impossible to have the payment and delivery contemporaneous in point of time.

Under the plaintiff's theory the fact at issue was the existence or nonexistence of a trust agreement containing certain conditions. There was no written agreement as such, and the only document in writing which is relied upon by plaintiff was the order given by him to McLeish to turn over the stock to the bank in consideration of the payment of the $1,400. This order was directed to the McLeish Securities Corporation and, therefore, collateral to the contract between plaintiff and the bank, but in any event does not on its face support the conclusion that payment was to be made only upon receipt of the

■ stock. Custom or usage to explain the true character of an instrument and to aid in its interpretation is admissible. (Sec. 10531, Rev. Codes.)  See *Lewis* v. *Aronow*, 77 Mont. 348, 251 Pac. 146, and *Parham* v. *Chicago etc. Ry. Co.*, 57 Mont. 492, 189 Pac. 227; also, Jones' Law of Evidence in Civil Cases, p. 875, to the effect that custom or usage may be used to explain written contracts.

The plaintiff contends that the deposition of J. M. McLeish ■■ was admitted without a proper foundation being laid therefor. The deposition was taken under subdivision 2 of section 10645, Revised Codes. Before the deposition became admissible, preliminary proof must have been made that the witness continued to be absent. (Sec. 10652, Id.) The only preliminary showing in the record is the statement made by counsel for the defendant, as follows: "We have made inquiry as to the whereabouts of Mr. McLeish and find that he is not, to the best of our knowledge, within the state of Montana, but according to our information and belief, resides in the City of Chicago, at some address unknown to the defendant, and is now within the City of Chicago." This statement is subject to the objections pointed out in *Reynolds* v. *Fitzpatrick*, 28 Mont. 170, 72 Pac. 510, where the same question was involved. The deposition should not have been received in evidence. However, the admission of the deposition does not call for a reversal of the judgment. Without it there was sufficient admissible evidence to support the court's judgment. The court announced that it would disregard incompetent evidence in reaching its decision, and when a cause is tried without a jury we will presume that this was done. (*Murphy* v. *La Chapelle*, 95 Mont. 36, 24 Pac. (2d) 131.)

The judgment is affirmed.

Mr. Chief Justice Johnson and Associate Justices Morris, Stewart and Erickson concur.