IN THE MATTER OF M. D. Y. R., A YOUTH IN NEED OF CARE.

No. 14011.
Submitted June 13, 1978.
Decided July 7, 1978.
Rehearing Denied Aug. 3, 1978.
582 P.2d 758.

John Schaefers, Havre, Steve L. Bunch, Legal Ser., argued, Helena, Patricia Connell, St. Louis Mo., argued, National Juvenile Law Center, for appellant.

Mike Greely, Atty. Gen., Helena, Ronald W. Smith, County Atty., Havre, David G. Rice, argued, Deputy County Atty., Havre, Richard A. Weber, Jr., argued, Helena, for respondent.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

L.Y.R., the respondent parent, appeals from the order of the District Court, Twelfth Judicial District, Hill County, Montana, denying respondent's motion for a new trial and from the original order entered in the District Court on January 12, 1977, declaring M.D.Y.R. a neglected youth in need of care and awarding her to the care, custody and control of the Department of Social and Re-

habilitation Services of the State of Montana with lawful authority to consent to her adoption.

M.D.Y.R. (hereinafter "child" or "baby girl") was born on May 24, 1975. Her mother is L.Y.R.; no father is named in the child's birth certificate. L.Y.R. had been divorced from J.Y.R., the putative father of the baby girl, on December 12, 1974. In the divorce proceedings the father was awarded the custody of the three children who had been born to his marriage with L.Y.R. and also three older children of L.Y.R., whom the husband had adopted during the marriage.

Following the divorce and until the time of the birth of the child, L.Y.R. resided with her mother. During her pregnancy, L.Y.R. was in contact with social workers of the Hill County Welfare Department and had indicated to them her interest in having an abortion and her concern about her ability to keep the baby after it was born.

When the child was born, L.Y.R. moved into an apartment of her own and for the first few weeks gave adequate care and attention to the baby. She received benefits under the Aid to Dependent Children program and was in contact with workers from the Hill County welfare department. In mid-June she became nervous and depressed for which conditions her social worker offered her counseling and mental services and arranged for her to attend a class in child care. L.Y.R. dropped out of the child care class after attending once or twice.

On September 7, 1975, a Sunday, the social worker called at L.Y.R.'s apartment and found that L.Y.R.'s daughter, P., was caring for the child. Earlier that day friends of L.Y.R. had come to her apartment. They and L.Y.R. had started drinking after which L.Y.R. left with her friends, telling P. that she would be back soon. P. was upset and worried when the social worker arrived. Checking later that afternoon, the social worker learned that L.Y.R. had not returned. The social worker made arrangements to place the child in a foster home. Although L.Y.R. was in contact with P. that evening, she did not get in touch with the social worker until the

second day following. L.Y.R. was not ready to take the baby girl back immediately and September 12 was scheduled for the baby's return. However, the return of the baby did not occur until September 15, because L.Y.R. in the meantime had been arrested and held for shoplifting a small amount of food in a grocery store.

On October 2, 1975, the social worker, checking again, found the child in the care of the grandmother, M.C., the mother of L.Y.R. The grandmother at the time was a 67 year old blind and although able to take care of herself and capable of caring for a small baby in her apartment, the grandmother had been left without an adequate supply of diapers and clothing for the child. The grandmother did not know where L.Y.R. was or how long she might be gone. At the grandmother's request, the social worker took custody of the child and again placed her with foster parents.

On the following day, October 3, 1975, the social worker met with L.Y.R., who was advised by her that the Department of Social and Rehabilitation Services of the State of Montana ("SRS") was going to petition the court for temporary custody of the child. On this occasion L.Y.R. agreed with the social worker on a program of betterment which would include (1) finding an apartment of her own, (2) taking treatment for her drinking, and (3) establishing and maintaining a relationship with the child through visitation at the foster home.

The petition for temporary custody and declaration that the child was neglected was filed by SRS on October 6, 1975. Hearing on the petition for temporary custody was delayed, however, because L.Y.R. had gone to Great Falls. On November 26, 1975, the District Court made an order awarding custody of the child to SRS for a period of six months. At the same time L.Y.R. agreed to a six month program covering the betterment program already mentioned and including an effort by her to find employment.

At the hearing of November 24, 1975, L.Y.R. was not represented by counsel nor was an attorney appointed to represent the child. During the hearing the District Court advised L.Y.R. that she could have a lawyer represent her if she wanted one at that time, but

L.Y.R. advised the court that "Legal Services wouldn't represent her". However, the District Court determined that since this was a petition for temporary custody, the District Court did not feel it had authority to appoint an attorney for the mother. The court advised the mother that if at any stage of the proceedings her rights as a parent would be finally terminated and the mother wanted an attorney, under those circumstances the court would appoint such an attorney. With that statement the hearing for temporary custody proceeded to its finish, and on December 1, 1975, the court entered its order granting SRS temporary custody of the child.

From December 1975 to April 1976, the social worker had frequent contacts with L.Y.R. who obtained employment and worked for two months. She quit work on April 2, 1976, because her back was bothering her. While she was employed, L.Y.R. maintained frequent visits with the child, but her visits were less regular when she was not employed. By the end of May 1976, L.Y.R. was still not ready to take over the full care of the child, and so she signed a parental agreement extending foster care for 30 additional days. During that period she represented to the social worker that she had obtained a job and an apartment when in fact she had neither. She then signed another 30 day extension of the foster care agreement. When she had neither job nor apartment at the end of the extended period, SRS determined to file its petition for permanent custody on August 12, 1976, upon L.Y.R.'s refusal to sign any further extension for foster care of the child.

Upon the filing of the petition for permanent custody by SRS, and its petition that SRS be given authority to assent to adoption of the child, the court ordered a hearing on the petition requiring the legal father and the natural mother of the child to appear personally to attend the hearing.

On August 27, 1976, hearing on the petition for permanent custody was held. SRS was represented by the deputy county attorney of Hill County. L.Y.R. and her former husband J.Y.R. appeared *pro se.* Before the hearing started, the District Court asked both the father and the mother if they understood they could be represented

by a lawyer should they want to contest the proceedings. Both indicated to the District Court at that time that they understood they had that right but that they were ready to proceed with the hearing. Thereupon the hearing was commenced, and two witnesses were called, one a representative of SRS and the second the putative father, J.Y.R. The third witness was the mother, L.Y.R., who when she began to testify immediately asked the court for a postponement of the hearing on the ground that she had consulted a Havre attorney but was having difficulty financially to meet the fee arrangements, and she stated that the attorney had advised her to ask the court to postpone the hearing. The District Court determined from the deputy county attorney that no request for a postponement had come from the other attorney, although there had been some contact by the attorney with the deputy county attorney about L.Y.R. and her case. Nevertheless, the District Court proceeded with the hearing, allowing the further examination of L.Y.R., the testimony of P.Y.R., a sister of the child, and of another woman with whom J.Y.R. was living at the time. Thereupon the hearing was continued with a comment by the District Court that it would satisfy itself on the question of the Havre attorney's representation of L.Y.R. and when that had been cleared up the hearing would either be resumed or the custody matter would be deemed submitted to the court for decision.

On September 15, 1976, James W. Spangelo, a Havre attorney, appeared as counsel for respondent L.Y.R. and moved to quash and dismiss the petition for permanent custody filed by SRS. Mr. Spangelo was not the attorney L.Y.R. had mentioned on August 27.

On November 24, 1976, the District Court entered its order granting the motion to vacate the order for temporary custody entered on December 1, 1975, and to set the same aside. It further ordered the petition for permanent custody to be heard by the court without a jury on December 10, 1976. However, the hearing was held before the court on December 13 and 17, 1976, at which hearing the mother was represented by Mr. Spangelo. Again, no attorney was appointed to represent the interests of the child at this hearing.

Following the hearing, the District Court received proposed findings of facts and conclusions of law, and on January 10, 1977, entered its findings of fact and conclusions of law to decide the case. Based on those findings, on January 12, 1977, the court determined that the baby girl was a youth in need of care and neglected or abused within the meaning of section 10-1301; R.C.M.1947, and that the best interests would be served by declaring the youth in need of care and awarding her to the care, custody, and control of SRS with lawful authority in SRS to appear in court and consent to her adoption.

In its findings the District Court determined that after the filing of the petition for permanent custody, SRS regulations prevented the mother from visiting with the child unless someone from the welfare department was present. Since August 12, 1976, the mother had not visited nor made any requests to visit with the child, giving as her reasons her belief that the child was receiving good care and her feeling that the presence of a social worker at the visits would make her feel uncomfortable. During 1976 the mother lived for a few months with another man, but at the time of the hearing had moved into an apartment of her own and had been working for about a month.

The court further found that prior to the birth and up to the time of the hearing the mother had had a drinking problem but that she had not followed through with any program of counseling or treatment and that she was subject to disturbing factors, including her divorce and pregnancy, the death of her sister in June 1975, and a continuing pressure or fear of pressure from her former husband, J.Y.R. She was subject to spells of extreme depression. She was unable or unwilling to carry through with plans or programs designed to help her to function as an adequate mother and had not demonstrated an ability to provide a stable home situation. The court had vacated the order of temporary custody entered on December 1, 1975, for the reason that no counsel had been provided to L.Y.R. for that hearing, but the child had continued to be in the custody of SRS throughout the proceedings for permanent cus-

tody upon the agreement of the mother that such custody be continued.

The court determined that the mother was unable to provide an adequate physical and emotional environment to promote the normal development of the child and that she was, even with state aid and assistance, unable to discharge the responsibilities and duties necessary for the subsistence, education, medical and other care required for the child's physical, moral and emotional well being.

On February 9, 1977, Mr. Spangelo withdrew as counsel for L.Y.R., and Montana Legal Services Association appeared to represent the respondent mother. New counsel moved the District Court for a reconsideration or a new trial which was by the court denied. Thereafter, the appeal ensued as we have above related.

On appeal the respondent mother, L.Y.R., is represented by Montana Legal Services Association, through its attorney. She raises these issues for review:

1. Is the initial temporary custody hearing in a dependency and neglect proceeding a crucial and formative stage of the proceeding so that an indigent parent should have the right to court appointed counsel under the due process or equal protection clause?

2. As applied to the facts of this case, was it reversible error for the trial court to fail to appoint counsel for the indigent mother pursuant to section 10-1310(12), R.C.M.1947, for the intitial custody hearing?

3. Did the trial court deny the child, M.D.Y.R., due process of law by failing to appoint independent counsel to represent her?

Also appearing on appeal, on behalf of the child, is the National Juvenile Law Center, Inc. of St. Louis, Missouri, through its staff counsel and local counsel. They also raise the issue that a child is denied due process of law in proceedings to determine parental rights when the court failed to appoint independent counsel to represent the child in those proceedings.

It is argued on behalf of the respondent mother that the requisites of procedural due process are particularly stringent because of the fundamental rights at stake in this cause; and that denying the

mother her right to counsel at the temporary custody hearing caused specific prejudice to her right and interests at a formative stage in the ligigation. It is further argued on behalf of the mother that the equal protection clause required the appointment of counsel for her at all stages of the proceeding, including the proceeding for temporary custody and finally that due process of law was denied by failing to appoint independent counsel for the child.

In the same manner, counsel for the child argued the child is denied due process in proceedings to terminate the parental rights when the court fails to appoint independent counsel to represent the child; that determination of parental rights involves a fundamental liberty interest of the child within the meaning of the due process clause; that the necessity of counsel to represent the child is as great as is the necessity for counsel in criminal proceedings; and appointed counsel is necessary since no other party to the proceedings can truly represent the best interests of the child.

Counsel for SRS answers these arguments by stating that lack of counsel for the mother at the temporary custody hearing does not constitute reversible error here because the court did in fact vacate the order issued for temporary custody; that her rights were not violated under the equal protection law by the failure to provide counsel for her at the temporary hearing; that it was not reversible error for the trial court not to appoint counsel under section 10-13-10(12), R.C.M.1947, at the temporary hearing; and that the child was not denied due process because the court did not appoint independent counsel for the child.

All of the stated issues boiled down to these two questions:

1. In this case, did the lack of appointed counsel to represent the mother at the temporary custody hearing eventually operate to deprive her of due process?

2. Did the lack of appointed counsel to represent the child individually at all stages of the proceeding deprive the child of due process or the equal protection of the law?

We first look to the situation involving the mother. To do this we examine the factual background that faced the District Court at the

time that it was presented with the petition for the temporary custody of the child. After all, legal principles of constitutional quality do not exist in a vacuum. They exist for application to facts, and it is, in the final analysis, the factual situation that determines whether constitutional rights have been violated.

The first hearing occurred, as we have said, on November 24, 1975. A petition had been filed by SRS asking for temporary custody of the child for six months. In the progress of the hearing it was developed that the child had been left with her sister, P., as we have earlier described on September 7, and from that time until the first week in October agents of the SRS were working with the mother trying to resolve some of the problems that were arising in connection with this small infant. From September 7 until October 2, the agent was seeing the mother regularly talking to her about child care classes, programs to overcome her alcoholism, and what could be done about getting her employment. Apparently, the only income the mother had was the money received by her under the Aid to Dependent Children program. On October 2, the SRS agent found that the mother had left the child with a blind grandmother the night before and the blind grandmother, although willing otherwise was not a suitable person to take care of the child because she could not see to place diapers upon the child nor to prepare food except from cans of formula. It was not a satisfactory situation for the child and so the SRS worker immediately aranged to have the child placed in foster care. This occurred on October 2, 1975. Nothing further was heard from the mother for a period of five days and when she did contact the SRS worker, it was learned the mother had been in Great Falls with friends for the period she was missing. The SRS then proposed that temporary custody be granted to it and in the meantime a program be developed as described above for the rehabilitation of the mother so as to make the home situation for the infant more suitable and stable. It was also the plan of SRS if during the six month period sufficient progress had been made, to return the baby to the mother and away from the foster care.

In any case involving a neglected child, the courts is faced with the choice of depriving the natural mother of the custody of the child if it might be better for the child to be placed in foster care. While that choice might present a dilemma for the court in some cases, in this case it was a dilemma with one horn. Under the factual situation presented, the court had absolutely no alternative but to award the temporary custody to the child to SRS so that under foster care she would have at least the creature comforts, if not the love and affection that the natural mother could provide.

Section 10-1310(10)(b) authorizes a petition for temporary legal custody. In section 10-1310(12), it is provided that the court may at any time on its own motion or the motion of any party appoint a guardian ad litem for the youth or counsel for any indigent party. It is contended on behalf of the mother that in this case, at the hearing for temporary legal custody, it should have been mandatory that the court appoint counsel to represent the mother. The statute, however, is not couched in mandatory language, and statutorily at least we must say that the matter of appointment of counsel, whether for temporary or permanent legal custody, is left to the discretion of the court. Moreover, under case law touching on this point, this Court has held that the appointment of counsel in a proceeding such as involved here is discretionary with the District Court, at least as far as the child is concerned. *In the Matter of Inquiry into J.J.S.* (1978), 176 Mont. 202, 577 P.2d 378; *In the Matter of Guardianship of Gullette* (1977), 173 Mont. 132, 566 P.2d 396; *Stubben v. Flathead County Dept. of Public Welfare* (1976), 171 Mont. 111, 556 P.2d 904.

In *Cleaver v. Wilcox* (9th Cir. 1974), 499 F.2d 940, the court of appeals considered the same problem. There, the court had before it the provisions of the California statute under which a child who is found to be "dependent" may be subjected to limited control or removed from the custody of his parents for an indefinite time, subject to periodic review. The plaintiffs, indigent parents of children involved, contended the state court was required to appoint counsel for them in such proceedings. The court noted the due process

factors involved, but refused to impose mandatory appointment of counsel for indigent parents upon the state court stating:

"This court does not believe it necessary to impose upon an excellent state-court system an infelxible constitutional rule which requires appointed counsel in every dependency proceeding. Rather, we believe that the class members can be fully protected by a statement of due-process principles in the form of a declaratory judgment. *Parents are entitled to a judicial decision on the right to counsel in each case.* The determination should be made with the understanding that due process requires the state to appoint counsel whenever an indigent parent, unable to present his or her case properly, faces a substantial possibility of the loss of custody or of prolonged separation from a child. Application of these guidelines can and should be made by the state courts on a case-by-case basis." (Emphasis supplied.) 499 F.2d 945.

In *Gullette* we held in a guardianship proceeding that when the custody of a child is in serious dispute, the court should either appoint independent counsel for the child or make a finding stating the reasons that such appointment was unnecessary. 566 P.2d at 400. Since Montana is within the area of jurisdiction of the United States Court of Appeals for the Ninth Circuit, and since it is appropriate that state rules respecting due process principles be in harmony with the federal rules on the same subject, in the same area, we hold the rule in *Cleaver v. Wilcox*, supra, applies in this jurisdiction: Where indigent parents are involved in dependency proceedings, the District Court shall make a judicial decision in each case as to whether such parents are entitled to counsel appointed by the court whenever the indigent parent, unable to present his or her case properly, faces a substantial possibility of the loss of custody or prolonged separation from the child. The factors which the District Court may consider in determining whether to appoint such counsel will vary from case to case but should the District Court refuse a request for counsel, the grounds for refusal must be stated in the record so that meaningful judicial review of the refusal can be had. *Cleaver*, 499 F.2d 945.

■ Having declared the applicable rule, we turn again to the facts of this case to determine whether counsel should have been appointed for the mother at the time of the hearing for temporary custody. The proposal of SRS at the time for temporary custody was just that: temporary. It had outlined a program to aid the mother, and to encourage her to help herself; the mother was to have liberal rights to visitation with the child and it was even indicated that custody would not be held for six months if it appeared earlier that the mother's situation had improved to the point where the child would not be neglected. While the District Court did not make findings along that line in refusing counsel, by the same token, the rule requiring such findings had not been declared by us until now. It is clear from the record the mother was not necessarily opposing the proposal of SRS and most certainly the proposal was in the best interest of the child. Moreover, even if the District Court had committed error on this point, and we do not believe so, it would be too late to cure it now.

It is further to be noted from the statement of facts which we have set forth hereinabove, that the mother's situation did not noticeably improve during the period that the temporary custody order was in effect, and self-help by the mother was particularly lacking. It does not appear from the record that at any stage in the period of the temporary custody that the mother was in a situation where the child could be returned to her with a reasonable expectation that the child would not be neglected. Moreover, when the mother was represented by counsel, and motion was made to dismiss and vacate the order of temporary custody, that order was by the court granted.

However, it is argued further on behalf of the mother that had the court in fact not deprived her of custody under the temporary order, her situation at the time of the hearing on the permanent deprivation of custody would have been different, particularly insofar as her relationship with her child was concerned. This may be, but it is entirely speculative. When the court conducted a hearing for permanent custody, at a time when the mother was in fact

represented by counsel, it appears again clear the District Court had no choice under the facts presented but to grant permanent custody of the child to SRS.

It cannot successfully be contended the mother was deprived of due process or equal protection of the law at the time of the hearing for permanent custody. She was represented by competent counsel, and the facts adduced at the hearing fully support the decision of the District Court to award the child's custody to SRS. As we stated in *In re Gore* (1977), 174 Mont. 321, 570 P.2d 1110, the primary duty of deciding the proper custody of children is a task of the District Court and therefore, all reasonable presumptions as to the correctness of the determination by the District Court will be made on appeal. The District Court findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion. *Solie v. Solie* (1977), 172 Mont. 132, 561 P.2d 443. We hold that the finding of the District Court that SRS was entitled to the permanent custody of the child, with the right to consent to her adoption, was proper and fully supported by the evidence.

We turn now to that portion of the case which relates to whether the child itself was entitled to be represented by counsel, independent of counsel for the mother, and whether the child in this case was deprived of due process or the equal protection of the law.

In denying the motion for new trial on that ground, the District Court stated:

"The Court now finds that [M.D.Y.R.] at all times during these proceedings has been and now is an infant of tender years, whose immaturity rendered and does now render her incapable of having or communicating her personal view as to how her best interests would be served herein, and further finds that counsel appearing before the Court have diligently sought to bring out for the Court's consideration all evidence bearing on the child's welfare, and that there is nothing before the Court to show that independent counsel for the child would have been able to produce additional evidence or otherwise benefit the child during the proceedings held to date,

and that no sufficient grounds for the granting of the motion have been shown."

While the District Court did not make findings as suggested in the decision in *Gullette* and *In the Matter of Inquiry into J.J.S.*, supra, nevertheless the determination by the court stating its reasons in its order denying the motion for new trial constitutes a "judicial decision" within the meaning of *Cleaver*. Moreover, the factual situation in this case is practically in complete agreement with what this Court said in *In the Matter of Inquiry into J.J.J.*:

"* * * Further, the rule is that the appointment of counsel is only necessary when the child needs an advocate to represent his position as to the issues in dispute or to ensure the development of an adequately complete record concerning the best interests of the child. *In the Matter of D* (1976), 24 Or.App. 601, 547 P.2d 175. Neither of those situations are present here. The minor child was too young to have any position on the issues and the record of the hearing is adequate to determine the best interests of the child. The District Court did not abuse its discretion in not appointing counsel for the child." 577 P.2d 381.

In line with what we have said foregoing respecting the rights of an indigent parent to counsel, we hold that the requirements of due process and equal protection of the laws do not require us to interpret section 10-1310(12) as to require in every case the appointment of counsel for the youth or child in dependency-neglect cases. In the same manner as for the parent, the rights of the child can be fully safeguarded if, on a case-to-case basis, the District Court makes a judicial decision as to whether the facts in each particular case require the appointment of counsel for the child. Again, should the judge refuse the request for counsel, the grounds for such refusal shall be stated in the record so that a meaningful judicial review of the refusal can be had.

This Court is not insensitive to the needs of indigent persons faced with complex litigation who may have no degree of expertise in the handling of judicial proceedings. Nothing in this record, however, indicates to us that the result in any of the proceedings

*before the District Court* would have had a different ending if counsel had been appointed for the mother and the child at all stages of the proceedings. There simply is not here a state of facts upon which a *cause celebre* can be made. While ordinarily counsel are most helpful to litigation, it may well be that the intrusion of counsel in this case has prolonged rather than lessened the problems involving this child. The debate on esoteric constitutional principles of due process and equal protection that in the final analysis do not apply here has taken one and one-half years. Meanwhile, this child is languishing in foster home care, and no steps have been taken to provide her with a stable, permanent home environment at a critical period in her formative years. She has received due process; but she is being unduly processed. It is for that reason that we advanced this cause on the calendar for oral argument and have expedited this opinion.

Affirmed.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY, HARRISON and SHEA concur.