No. 81-478

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

_____

IN THE MATTER OF M.F., J.F.,
and R.W., YOUTH IN NEED OF CARE.

_____

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Diane Barz, Judge presiding.

Counsel of Record:

For Appellant:

Gary E. Wilcox, Billings, Montana

For Respondent:

Harold F. Hanser, County Attorney, Billings, Montana
Olsen, Christensen & Gannett, Billings, Montana
Damon Gannett, Billings, Montana

_____

Submitted on briefs: September 30, 1982

Decided: November 24, 1982

Filed: NOV 24 1982

*Thomas J. Kearney* _____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

On December 4, 1980, the Department of Social and Rehabilitation Services petitioned the District Court of the Thirteenth Judicial District, in and for the County of Yellowstone, for permanent custody of J.F., M.F., and R.W. and for termination of all parental rights. After hearings on December 29, 1980, April 10, 1981, and April 15, 1981, the District Court granted the petition. Final judgment was entered August 4, 1981, and the natural mother appeals.

Petitioner is the natural mother of J.F., M.F., and R.W. Each of the children have a different natural father. J.F. was born April 11, 1967, in Billings, Montana. M.F. was born May 11, 1970, in Billings, Montana. R.W. was born December 9, 1974, in Farmington, New Mexico.

The Department of Social and Rehabilitation Services (SRS) first had contact with the natural mother in 1967. Especially during the time period from 1976 through 1981, SRS received numerous complaints alleging abuse and neglect of the three children. Incidents of physical abuse were sporadic and generally involved one of the mother's four husbands, or many boyfriends. In October, 1976, Ron Cooper, the mother's then husband, threw R.W. against a wall. R.W., who was then only twenty-two months old, suffered a broken leg as a result of the incident. In November, 1976, M.F., then six years old, arrived at school with a swollen upper lip. M.F. told her teacher that her mother had struck her with a switch. In the fall of 1979, M.F.'s teacher observed bruises on M.F.'s leg and fingermarks on her arm. M.F. told her teacher that "the man" who was living with her mother at the time had kicked her and grabbed her arm. In January, 1980, M.F. missed one day of school. The next day M.F. told her school principal that Cyrus Watson had struck her and that she suffered cracked ribs as a result of the blow. Watson was living with the mother at the time.

A public health nurse, Lil Anderson, had several contacts with the children. In 1976, Lil Anderson made her first visit to the family home. She found the home to be quite dirty and noted that there was little or no food in the home. Ms. Anderson gave the mother instructions regarding nutrition, cleanliness, and appropriate dress for the children. When Ms. Anderson worked with the family on a regular basis, the house conditions would improve. When she didn't see the family for a period of about one month she noticed the children's care would deteriorate.

Several complaints during the five-year period concerned the children's general health and well-being. In June, 1978, a social worker found J.F. standing on Rimrock Road at 11:30 p.m. He had been reported standing there for three and one-half hours. J.F. stated that he had left his mother's home because his mother's then husband had upset him.

In 1979, M.F. came into contact with Kathy Rumph, a school teacher at Newman Elementary School. At Newman, M.F. was placed in a program called the resource room. To qualify for placement in the resource room a student must be at least one year behind in normal grade level performance. Ms. Rumph testified M.F. showed signs of severe emotional disturbance. M.F. was defensive and remained isolated from the other children. She was unable to play with other children and at times would talk "baby talk." While at Newman, M.F.'s appearance was generally unkept. Her clothes were generally dirty and ill-fitting. On several occasions she came to school with inappropriate dress for the weather conditions. M.F. had a physical problem causing her to wet the bed at night and would sometimes come to school after having wet the bed and had not bathed or showered in the morning. M.F. told Ms. Rumph that she was occasionally left alone for entire weekends without food to eat. Ms. Rumph and M.F.'s classroom teacher arranged to feed M.F. breakfast everyday when she arrived at school. After M.F. was fed a good breakfast her academic performance would improve markedly.

In December 1979, the family moved to an area just outside of Billings known as Lockwood. Sherry Lithander, the principal of Lockwood School, had considerable contact with M.F. and J.F. Ms. Lithander testified M.F. was placed in a program similar to the program at Newman School. Special arrangements were made to feed M.F. every morning. Ms. Lithander testified M.F. often came to school with dirty and improper clothing. M.F. had problems in the classroom and tended to fantasize. Again, M.F. was placed in a special learning program to compensate for her academic deficiencies.

In April 1979, M.F. was placed in foster care. The school personnel recognized a substantial improvement in M.F.'s physical and emotional well-being. M.F. was well-dressed and well-fed and began to feel better about herself. She became better accepted by her classmates. In May 1979, M.F. was returned to her mother and her improvement subsided.

Susan Betz also had contact with M.F. at Lockwood School beginning in December 1979. Ms. Betz conducted numerous tests with M.F. The test results showed M.F. exhibited some learning disability. Ms. Betz found M.F. to be two to two and one-half years behind her academic age level. M.F. showed a certain evasiveness which attributed to her performance at school and her lack of friends.

In August, 1980, M.F. and R.W. were again placed in foster care. Both Ms. Lithander and Ms. Betz noticed considerable improvement in M.F.'s behavior and appearance during the 1980-81 school year. Ms. Lithander also had contact with R.W. during the 1980-81 school year when R.W. was enrolled in kindergarten. R.W. showed signs of slow development and suffered from environmental and cultural deprivation which was attributed to her home environment during her pre-school years.

Collette Melia, a neighbor of the family at Lockwood, testified about the children's home conditions. She testified that on several occasions she fed R.W. because the child would

ask her for food. On one occasion Mrs. Melia observed R.W. outside the family's trailer at approximately 8:15 a.m. trying to get in. Although the morning temperature was very cold, R.W. was wearing only a light jacket. R.W. was crying but no one would open the door for R.W. to enter the house.

On one occasion in August 1979, the mother left the three children sleeping in the trailer. A roast which was left cooking in the oven caught fire and neighbors had to remove the three children.

On August 8, 1980, M.F. and R.W. were placed in foster care with Kaye Nelson. Mrs. Nelson testified about the girls' condition when they first arrived at her house. Mrs. Nelson stated the girls seemed desperate for love and affection and would cling on anyone who would allow it. When the girls arrived they were both very hungry and R.W. was very skinny. The two lacked table manners and would hide food in their rooms. M.F. had a very low self-esteem. Although R.W. could talk, M.F. usually had to translate for R.W. when she spoke. At the time of the hearing both girls showed excellent overall improvement. R.W. was better able to communicate and had a normal appetite. M.F.'s feelings about school and herself had undergone a drastic change. The children had made friends and were getting along quite well at school. While the girls were in foster care they had sporadic home visits with their mother. The visits did not show signs of any improving relationship between the mother and the two girls. During some home visits the mother would leave the girls with J.F. to babysit when she had other plans.

Judy Robinson, a social worker, testified about her contact with the children. After January 1979, to the time of the foster care placement, the Welfare Department received twenty-one complaints about the children's care from eight to ten different people.

Dr. Robert E. Tompkins performed a psychological evaluation of the mother in February 1981. The results of the tests indi-

cated the mother possessed personality traits that would inter-
fere with her ability to provide a stable environment for the
children. Dr. Tompkins found the mother had limited intellect
and demonstrated poor judgment. Dr. Tompkins testified the
mother was likely to respond to her needs first and those of the
children later. Dr. Tompkins testified given the mother's per-
sonality and problems, counseling would not be beneficial. Dr.
Tompkins further testified it was unlikely the mother would ever
change to provide a stable environment for the children.

On April 30, 1980, SRS filed a petition for temporary
investigative authority relative to J.F., M.F. and R.W. in the
District Court of the Thirteenth Judicial District. On December
4, 1980, SRS filed a petition for permanent custody and authority
to assent to adoption of the children. Hearings were held on
December 29, 1980, April 10, 1981, and April 15, 1981. The
District Court entered findings of fact and conclusions of law on
July 2, 1981. Judgment was entered on August 4, 1981. The
District Court declared J.F, M.F. and R.W. to be youths in need
of care and ordered the parental rights of the natural mother
terminated. The District Court further ordered permanent custody
of the youths be awarded to SRS with consent to adoption. J.F.
was ordered to be placed in the care of the natural mother. The
mother appeals.

The issues raised on appeal are as follows:

1. Whether the District Court erred in failing to appoint
counsel for the mother at the time of the application for tempo-
rary investigative authority.

2. Whether the attaching of a "report to the court" to the
petition for permanent custody and authority to assent to adop-
tion constitutes reversible error.

The mother argues the District Court should have appointed
counsel to represent her at the time SRS filed the temporary
investigative authority (TIA). She claims the period from the
issuance of the TIA to the filing of the petition for permanent

custody is used largely to compile evidence to support termination of the parent's rights. Thus, the mother contends the assistance of counsel is essential to insure due process.

In Lassiter v. Department of Social Services (1981), 452 U.S. 18, 68 L.Ed.2d 640, 101 S.Ct. 2153, the United States Supreme Court granted certiorari to consider a natural mother's claim that appointment of counsel is essential at the termination stage. The United States Supreme Court stated:

> "In sum, the Court's precedents speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

> "The case of Mathews v. Eldridge, 424 U.S. 319, 335, propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." 452 U.S. at 26.

In Lassiter, the United States Supreme Court held the trial court did not err by failing to appoint counsel for a natural mother in a termination proceeding where the mother did not appear at the initial custody hearing and did not even speak to her retained lawyer after being notified of the termination hearing. The United States Supreme Court held, given the facts before them in this particular case, the three Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.

This Court agrees with the United States Supreme Court's holding in Lassiter, supra, and has held that the same rationale should be applied in determining whether appointment of counsel is necessary at the TIA stage as well as the termination stage.

In, Matter of M.D.Y.R. (1978), 177 Mont. 521, 582 P.2d 758, a natural mother claimed the lack of appointed counsel at a temporary custody hearing deprived her of due process. This Court held:

> "It is contended on behalf of the mother that in this case, at the hearing for temporary legal custody, it should have been mandatory that the court appoint counsel to represent the mother. The statute, (section 10-1310(12), R.C.M. 1947, now codified as section 41-3-401(12), MCA), however, is not couched in mandatory language, and statutorily at least we must say that the matter of appointment of counsel, whether for temporary or permanent legal custody, is left to the discretion of the court." 582 P.2d at 764.

Section 41-3-401(12), MCA, states, "[t]he court may at any time on its own motion or the motion of any party appoint a guardian ad litem for the youth or counsel for any indigent party." Thus, as we stated in M.D.Y.R. the language is discretionary and appointment of counsel is not mandated in every case. As the United States Supreme Court held in Lassiter, supra, there is a presumption against the right to appointed counsel and only if the three Eldridge factors overcome this presumption will due process require appointment of counsel. The three factors: private interests, government's interest and risk of erroneous decisions do not overcome the presumption in the present case. The private interests are the parent's desires and rights to the custody of her natural born children and the children's right to live a bountiful life free of abuse and neglect. The government has interests in the welfare of the children and the rights of the parents as well as an interest in an accurate and just decision. Lastly, we must consider the risk that a parent will be erroneously stripped of their parental rights because they were not represented by counsel. The United States Supreme Court weighed the three factors in Lassiter stating:

> "If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore

- 8 -

require the appointment of counsel." 452 U.S. at 31.

In the present case, although the parent's interests are strong, the State's interest is not weak nor were the risks of error at a peak. The State has a great interest in a just and accurate decision for all parties concerned and the risk of error is unsubstantiated. The mother claims that the TIA stage to the termination stage is simply for the compilation of evidence and that assistance of counsel is therefore essential. However, counsel was appointed for the mother on December 8, 1980. The hearings on the petition for permanent custody were held on December 29, 1980, April 10, 1981 and April 15, 1981. We feel the appointment of counsel prior to these hearings did accommodate the mother's right to due process. We cannot compare this situation to that of a criminal proceeding where a defendant requires effective counsel to advise him of his constitutional rights at the pretrial stage. Here, there was no investigation by the SRS which would be altered by the entrance of legal counsel. In addition, the mother did not raise sufficiency of the evidence as an issue on appeal. If there was a specific evidentiary problem with the SRS investigation, it seems the mother would have raised it, although she did not. Thus, we hold the mother was not deprived of her right to due process of law.

The mother further argues the submission of a social worker's "report to the court" along with the petition for permanent custody is reversible error. The section governing abuse, neglect and dependency petitions neither requires nor prohibits attaching a social worker's report along with the petition. See section 41-3-401, MCA. Thus, we must look at the facts of each case to determine whether such a report will constitute reversible error.

In Matter of Moyer (1977), 173 Mont. 208, 567 P.2d 47, this Court did not rule specifically on whether a prehearing report in support of a petition for permanent custody is error. However, we did state:

> "It is true that a judge violates due process requirements if he bases his child custody order on statements in a welfare department report without requiring the authors of the report to testify at a hearing and be subject to cross-examination [citations omitted]. In a civil case, such as the one at bar, which is tried before the court without a jury, there is a presumption that the trial judge has disregarded all inadmissible evidence in reaching his decision. O'Sullivan v. Simpson, 123 Mont. 314, 212 P.2d 435; Healy v. First National Bank, 108 Mont. 180, 89 P.2d 555." 567 P.2d at 49.

The possibility for error would be great where a trial court relied on reports not supported by examination at a custody hearing. However, here the report in question was authored by Judy Robinson, a social worker, who did testify at the hearing. Her testimony at the hearing was essentially what was contained in the report. The mother did have ample opportunity to cross-examine Judy Robinson and point out any hearsay statements or defects in the report at the hearing. As stated above, there is a presumption that the trial court has disregarded all inadmissible material in making its decision. Here, the mother has cited nothing to rebut this presumption.

The mother argues the report contains events which are too remote in time to be of probative value. In Matter of K.V. and K.A. (1982), _____ Mont. _____, _____ P.2d _____, 39 St.Rep. 1582; this Court ruled on this exact argument stating:

> "Appellant believes that it was improper for the District Court to base its termination decision on events which occurred before KA was adjudicated to be a youth in need of care. Appellant would require a showing by the State that the circumstances and conditions which predated the adjudication continued to exist at the time of termination. While such a showing might be appropriate if SRS had only recently begun to work with the family, in a situation where the parent has been assisted and monitored by SRS over a period of years and the family environment has not yet stabilized and perhaps even deteriorated, to require more would beg for experimentation at the expense of the child's best interest." 39 St.Rep. at 1585.

Here, SRS has had contact with the family since 1967. We cannot say that any of the evidence contained in the report was too remote to be of probative value and thus inadmissible at the

- 10 -

custody hearing.

We feel compelled to mention that although the mother has relied heavily on Matter of Swan (1977), 173 Mont. 311, 567 P.2d 898, the facts of this case are quite different from Swan. In Swan, SRS filed several written reports with the petition for permanent custody. The authors of the reports did not testify at the custody hearing. In fact, the entire proceeding was peppered with hearsay evidence which was also allowed as testimony at the hearing. For that reason this Court reversed. However, in the present case the author of the report did testify at the hearing and the mother was allowed to cross-examine. We find no error in the submission of the report when the petition was filed given these circumstances.

We also find it necessary to comment upon a discrepancy in the trial court's final custody order. The relevant sections of the order state:

> "3. IT IS HEREBY ORDERED that the parental rights of [C.W.], natural mother of the above-named youths [M.F. J.F. and R.W.], are terminated.

> "5. IT IS HEREBY ORDERED that the permanent care, custody and control of the above-named youths be awarded to the Department of Social and Rehabilitation Services of the State of Montana, and a representative of the Department of Social and Rehabilitation Services be authorized to appear in any Court where adoption proceedings are pending concerning [M.F.] and [R.W.] and assent to adoption.

> "6. IT IS HEREBY ORDERED that [J.F.] be placed with [C.W.]."

The effect of this order as to J.F. is to terminate the parental rights of the natural mother, place legal custody in the SRS yet give physical custody to the natural mother. While after a finding of abuse and neglect at a dispositional hearing the trial court may allow the parents to retain physical custody of the children pursuant to section 41-3-406(a), MCA., once parental rights are terminated physical custody by the natural parents is no longer an alternative. Section 41-3-611, MCA, states:

> "Effect of decree (1) An order for the term-

- 11 -

ination of the parent-child legal relationship divests the child and the parents of all legal rights, powers, immunities, duties, and obligations with respect to each other as provided in title 40, chapter 6, part 2, except the right of the inherit from the parent."

Here, it appears the lower court only intended to terminate the parental rights of M.F. and R.W. and we remand to the lower court for an appropriate order.

Judgment is affirmed in part and remanded to enter a proper final custody order.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices