No. 89-126

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

_____

IN THE MATTER OF
A.B., Youth in Need of Care.

_____

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel Roth, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Bell & Marra; Antonia P. Marra, Great Falls, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Helena, Montana
James Yellowtail, Asst. Atty. General, Helena
Patrick L. Paul, County Attorney; Tammy Plubell, Deputy,
Great Falls, Montana
Billy Miller, Great Falls, Montana (Mother)
June Lord, Great Falls, Montana (A.B)
Leota Standing Bear, Box Elder, Montana (Tribal Rep.)

_____

Submitted on Briefs: Aug. 24, 1989

Decided: September 29, 1989

Filed:

_____
Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the District Court of the Eighth Judicial District, Cascade County, State of Montana. The appellant/father appeals the District Court's December 20, 1988 order terminating his parental rights in regard to his daughter, A.B. We affirm.

On September 25, 1987, approximately one week before A.B's first birthday, the Montana Department of Family Services, (Family Services) filed for temporary legal custody of A.B. The petition alleged that A.B. was abused, neglected or dependent within the meaning of § 41-3-102, MCA. The petition requested that A.B. be declared a youth in need of care and that A.B.'s temporary legal custody be granted to Family Services until further order of the court.

The District Court on September 28, 1987, issued its order and granted temporary legal custody of A.B. to Family Services until further order of the court. The District Court's September 28, 1987 order further ordered A.B.'s father and mother to appear before the court on October 14, 1987, "to show cause, . . . why they . . . have not complied with this Order." The order also stated that "An Adjudicatory Hearing will be held in conjunction with the Show Cause hearing."

Two attempts were made by a deputy county attorney to serve A.B.'s natural parents with a citation for them to appear in court for the show cause hearing. However, the deputy county attorney was unable to make service due to the unknown addresses of A.B.'s parents. Therefore, A.B.'s parents were served by publication.

The adjudicatory hearing was held November 17, 1987. During that hearing pediatrician, Jack Haling, M.D., and a

county social worker testified as to the cause of A.B.'s injuries being the result of physical abuse of the child. The following facts were testified to by Dr. Haling during that adjudicatory hearing:

> Q When you saw her [A.B.] in May [1987] when she was transferred from Missoula, can you briefly summarize for the Court what you discovered from your examination of her?
>
> A [By Dr. Haling] Sure. The history was that the child was allegedly well until she had an episode on the 17th of May, [1987] and the child at that time was found by her father to be gasping and choking and had no respiratory effort. She allegedly was resuscitated by hitting her on the back several times and given mouth to mouth resuscitation and taken to White Sulphur to see Dr. Laurence Casazza . . .

Dr. Haling testified further to the extent of A.B.'s injuries, including:

> [T]he workup in the hospital essentially showed she had a closed head injury which really couldn't be explained by any kind of single traumatic event. She had cerebral edema brain swelling and we did X-rays of her entire body, and she was found to have fractured or dislocated the left elbow, and there were some fractures of the right fourth, fifth, sixth and seventh ribs. She had some fractures of the tibias . . . and had some evidence of trauma to the right femur which possibly could be from old fractures, and she had a fracture of the shaft or midportion of the left forearm. And, all of these X-ray findings of this boney [sic] trauma was of varying stages and various stages of healing.

Finally, Dr. Haling testified as to A.B.'s prognosis:

3

> Well, her prognosis is very regarded because . . . of the brain damage which is the main problem. The boney [sic] things will heal up pretty well, but she has significant brain damage. She has brain atrophy, and that her brain has been damaged to the point that it's becoming smaller instead of growing which it is supposed to do at this age. She is an abnormally -- she has consultations in Helena, and the child is doing well with the rehab program, but certainly does not appear that she will ever have a perfectly normal life neurologically.

A.B.'s parents, although served by publication did not appear at the November 17, 1987, hearing.

The District Court on November 23, 1987, issued its order and declared A.B. a youth in need of care and granted temporary custody of A.B. to Family Services until further order of the court. The court also set the disposition hearing to be held on December 11, 1987 at which time Family Services was ordered to submit for the court's approval a proposed treatment plan for A.B.'s mother and father.

The disposition hearing was held on December 11, 1987, and a treatment plan was ordered and counsel appointed for A.B.'s mother and father. The treatment plan for A.B.'s mother and father was approved on December 28, 1987, neither the father nor counsel objected to the treatment plan nor attempted to modify its terms.

The father failed to comply with a single requirement of the plan, despite the efforts of social worker Lorna Antonsen to explain its requirements and assist the father in compliance. The father failed to comply with the treatment plan when he failed to maintain contact with the social worker assigned to A.B.'s case; and failed to maintain both reasonable visitation of A.B. and knowledge of her medical condition. Finally, the father attempted to visit A.B. only

4

one time during the eighteen month period of time between A.B.'s hospitalization on May 21, 1987 and the termination hearing on December 9, 1988, another failed compliance to his treatment plan.

On behalf of both parents, appointed counsel, Billy B. Miller, filed motions with the District Court on June 27 and July 5, 1988. On July 26, 1988, a review hearing was held, counsel Miller appeared for the mother, June Lord appeared on A.B.'s behalf, and, at the State's request, the District Court appointed counsel, Michael R. Tramelli, to represent the father in any further proceedings. Thereafter, on August 29, 1988, a petition for permanent legal custody and termination of parental rights of the father was filed with the court. Counsel Tramelli was permitted to withdraw as counsel for the father by order of the District Court filed October 5, 1988, and Antonia Marra was appointed to represent the father on that date.

On December 9, 1988, the hearing on the petition for termination of the father's parental rights was held in the District Court. Testimony was presented by Bill J. Tacke, M.D., a physician specializing in physical medicine and rehabilitation; Lorna Antonsen, social worker with Blaine County Human Services; and Randy Koutnik, social worker for Family Services in Cascade County. Also, Deputy Cascade County Attorney Tammy K. Plubell, counsel Marra, for the father, and counsel Lord on behalf of A.B. were present. The father was not present, as he was serving a twenty-year prison sentence in the Montana State Prison. He had been convicted in Flathead County for aggravated assault of his daughter, A.B.

Thereafter, on December 20, 1988, the District Court entered its findings of fact and conclusions of law and order terminating the parental rights between the father and A.B.

5

The father now appeals from the December 20, 1988, order and presents three issues on appeal:

1. Whether a parent has a statutory or constitutional right to appointed counsel at every stage of child protective proceedings resulting in termination of parental rights.

2. Whether the treatment plan was impossible to complete and therefore an abuse of discretion.

3. Whether § 41-3-609(2)(e), MCA, authorizes consideration of criminal convictions and sentences of long-term incarceration unconfirmed by appellate review.

On appeal the father alleges he has a constitutional right to appointed counsel at every stage of a child protective proceeding which resulted in the termination of his parental rights. Throughout the proceedings upon the petition for permanent legal custody and termination of his parental rights, the father was represented by appointed counsel.

For the October and November, 1987 hearings, the father was served by publication because his whereabouts were unknown despite efforts to locate him. However, he claims that the absence of appointed counsel during the initial phases of the child custody proceedings violated his rights and was prejudicial to him. He also alleges that his rights were violated because he was not personally served with notice of the October and November, 1987, hearings.

In child protective proceedings culminating in the termination of parental rights, due process of law requires only that the parents have counsel prior to the permanent custody hearings. Due process does not require that the parents have counsel during the initial stages of the proceedings. Matter of M.F. (1982), 201 Mont. 277, 653 P.2d 1205. In so holding, this Court relied upon the United

6

States Supreme Court in Lassiter v. Department of Social Services (1981), 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640.

The record indicates that counsel was appointed to represent both parents December 14, 1987. The father had the benefit of appointed counsel almost one full year prior to the termination of his parental rights. Furthermore, at the father's termination of parental rights hearing on December 9, 1988, the father was represented by appointed counsel.

The test approved by the court under the circumstances of this case does not warrant the conclusion that the appointment of counsel at the inception of this case was necessary or mandatory. Every effort was made to provide legal assistance at appropriate times and several times it was necessary to locate the parents, parents who showed little or no interest in their child, A.B. We find no merit in the father's first issue.

The second issue raised by the father is that the court's treatment plan was impossible to complete and therefore an abuse of discretion. The father objects that the plan's timetable was too short, roughly one and one-half months. He also contends that when the plan was submitted, the State was aware that he had advised counsel of his disagreement with its central objective, that is of course the removal of the child.

Parental rights of the father were terminated under § 41-3-609(1)(c), MCA. Under that statute the court may order a termination of the parent-child relationship upon the finding that "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; . . ." Section 41-3-609(1)(c)(i), MCA.

7

In Matter of C.L.R. (1984), 211 Mont. 381, 685 P.2d 926, this Court made clear its preference for the use of a treatment plan:

> [W]e sound a stern warning that this Court will not permit the termination of parental rights without first establishing a treatment plan unless a showing of facts clearly proves the impossibility of any workable plan.

Matter of C.L.R., 211 Mont. at 386, 685 P.2d at 928.

Here, the treatment plan was approved by the District Court on December 28, 1987. It required the father to obtain psychological and alcohol dependency evaluations by January 15, 1988, and to comply with the associated recommendations. It also required that the father visit A.B., meet with A.B.'s doctors, and maintain contact with the social worker and keep the social worker informed of his current address. The plan also advised the parents that noncompliance by February 15, 1988, could result in the potential loss of their parental rights.

In view of the District Court's finding that the father failed to comply with a single requirement of the plan, we find the District Court did not err when it ordered treatment objectives of the plan completed by February 15, 1988. Further, the father claims that because of the criminal charges he was facing in Flathead County, and under the advice of his criminal defense counsel, he did not comply with the psychological evaluation. We find no merit in this contention. The record indicates that the father was represented by at least three different attorneys throughout these proceedings and the record is completely devoid of any objection to the terms of the treatment plan, and equally devoid of any attempt to modify its requirements or time limits.

The final objection is that § 41-3-609(2)(e), MCA, authorized consideration of criminal convictions and sentences providing for long-term incarceration. The father argues that the trial court may not, in the termination of parental rights, rely upon a criminal conviction and sentence of imprisonment unconfirmed by appellate review. No authority is offered in support of the foregoing proposition. We find no provision authorizing consideration of "long-term confinement" under the provisions of § 41-3-609(2)(e), MCA. Therefore we find no abuse of discretion.

The judgment is affirmed.

_____
Justice

We concur:

_____
_____
_____
_____
Justices

9