No. 99-678

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 60

IN RE THE MATTER OF A.M.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Third Judicial District,

In and for the County of Anaconda-Deer Lodge,

The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin E. Vainio, Butte, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Jennifer Anders, Assistant Montana Attorney General, Helena, Montana; Michael B. Grayson, Deer Lodge County Attorney, Joan Borneman, Deputy Deer Lodge County Attorney, Anaconda, Montana

Guardian Ad Litem:

Sherry Petrovich-Staedler, Anaconda, Montana

Submitted on Briefs: April 12, 2001
Decided: April 17, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The natural mother of A.M. (hereinafter B.V.) appeals from the Findings of Fact, Conclusions of Law and Decree entered by the Third Judicial District Court, Anaconda-Deer Lodge County, which terminated her parental rights to A.M., and awarded permanent legal custody with the right to consent to adoption to the Department of Public Health and Human Services.

¶2 We affirm.

¶3 B.V. raises five claims of error that have been framed by the following issues:

> 1. Did the Department prove with clear and convincing evidence that A.M. was abused and neglected and was, thus, a youth in need of care so as to allow the termination of parental rights?

> 2. Did the District Court violate B.V.'s due process rights by basing the termination of parental rights on the supposed adjudication of the child as a youth in need of care at an earlier hearing on a petition for temporary investigative authority where at the time of that hearing the parent was an indigent mental patient civilly committed to an institution and was then unrepresented by counsel?

> 3. Was sufficient evidence presented to terminate parental rights without a prior treatment plan under § 41-3-609(4)(a), MCA (1997)?

> 4. Did the District Court err in applying § 41-3-609(4)(b) (1997), which excuses the requirement of a treatment plan if the parent is incarcerated for more than one year?

> 5. Did the termination of B.V.'s parental rights violate the Americans with Disabilities Act by imposing different standards for a parent with mental illness compared with standards imposed on other parents?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On January 30, 1998, the Department of Public Health and Human Services

(hereinafter the Department), received a referral that there was a two-year-old girl at a residence in Anaconda, Montana, that had been bitten by a dog. Terri Waldorf, a community social worker supervisor with the Department's Children and Family Services Division, went to the home accompanied by law enforcement officers and an animal control warden. They found at least 12 dogs inside the house, approximately the same number outside the house, and discovered canine urine and feces on the floors, on the two beds, and on the girl's toys.

¶5 The girl, A.M., who was born October 12, 1995, was in the care of her grandmother at the time. When asked about the condition of the bedroom and the house in general, the grandmother explained that she and A.M. had been sleeping on the couch in the living room, rather than in the bedroom, and that she cleaned up after the dogs every day when she returned home from work at a local fast-food restaurant. It was not clear who cared for the child while the grandmother was at work. A.M. was removed from the house and placed in foster care.

¶6 A.M.'s guardian ad litem would later report that the girl smelled so bad "it was hard to get near her" and she was not potty trained and "still on the bottle." Her teeth were decayed and several would later be removed while in foster care. The child, however, had not received a bite from a dog sufficient to leave a physical mark. At all times in this matter if and to what extent A.M. has suffered any type of developmental delay due to her care and living environment has been in dispute.

¶7 Waldorf filed a report to the District Court along with the deputy county attorney's petition for temporary investigative authority and protective services on February 3, 1998. Waldorf attested that A.M.'s mother, B.V., was at Warm Springs State Hospital at the time A.M. was removed from the home, and was subject to numerous criminal charges. The report stated that B.V. was "seriously mentally ill and a danger to herself or others." Waldorf stated that the home A.M. was found in was unsuitable to live in. Waldorf also acknowledged that B.V.'s criminal status--uncertain at the time--needed to be addressed "in order to effectively plan to parent and ensure the safety of her child." A show cause hearing on the petition was scheduled for February 18, 1998, and a guardian ad litem was appointed for A.M.

¶8 In a February 4, 1998 court order, the court found that A.M. was abused or neglected or in danger of being abused or neglected pursuant to § 41-3-102, MCA (1997), and that the removal of A.M. from B.V.'s home was necessary in light of the need to protect A.M.'s

welfare. Thus, the court declared that A.M. was a youth in need of care, the Department was granted a 90-day temporary investigative authority over the matter, and the Department could place A.M. in foster care during that period.

¶9 The minute entry from the February 18th hearing indicates that B.V. agreed to the temporary placement of A.M. in foster care. She indicated to the court, however, that she disagreed with the Department's indication that perhaps she had personally neglected A.M. B.V. has, in fact, repeatedly insisted throughout this matter that she, herself, did not "place" the child with her mother subsequent to her arrest and committal to Warm Springs on December 23, 1997. Records kept by the Department as well as testimony indicate that B.V. initially left the child in the care of either her mother or father.

¶10 A March 11, 1998 order reiterated that A.M. was a youth in need of care, and that if A. M. remained in B.V.'s home it would be "contrary to the welfare of the youth."

¶11 On May 12, 1998, the deputy county attorney petitioned the court for a six-month temporary legal custody of A.M. The petition identified two alleged fathers (a third would later be added although paternity was never established in this matter), and requested that the Department be given the right to require the "parents of the above named youth to complete a treatment plan." A hearing, pursuant to this petition, took place on June 3, 1998. B.V. appeared and was represented by counsel at this hearing.

¶12 A report to the court filed by A.M.'s guardian ad litem provided a brief indication of B. V.'s history. Apparently, B.V. was subjected to sexual and physical abuse by her parents growing up, and had been in and out of foster homes. She first attempted suicide when she was 12 or 13 years old. Apparently, she was first admitted into Warm Springs when she was 14 years old, in 1982. Soon after her release, she moved to Oregon to live with relatives. The record indicates that she had a criminal record in Oregon as well as episodes of substance abuse. Soon after marrying, B.V. served three years in prison on a kidnaping charge. There was also evidence that she physically abused her husband's son during that period--although B.V. claims she took the blame for the abuse to keep her husband (now former husband) from being extradited to Mexico. Upon release in 1993, she returned to Anaconda where her parents live.

¶13 The record indicates that B.V. was committed to Warm Springs in December of 1997, following an incident where she took her impounded car from police custody, eluded officers, and drove the wrong way down a one-way street onto a playground. She

attempted suicide in jail, which led to her commitment to Warm Springs. At the time, she was not taking her medication for her bipolar disorder. B.V. was scheduled for release from Warm Springs in March of 1999, after receiving a five-year sentence, with four years suspended, for criminal endangerment.

¶14 Waldorf testified at the hearing that there was no substantiated evidence that B.V. herself had ever abused or neglected A.M. Waldorf corroborated B.V.'s claim that she had, while in Warm Springs, requested that the Department remove A.M. from her mother's care on December 24, 1997. The record indicates, however, B.V. wished to have her boyfriend and his family care for the child, rather than a family member. Waldorf also testified that B.V. had then changed her mind before an investigation was made, and that although foster placement with a family member was desirable, no family member other than B.V.'s mother was immediately available. The boyfriend, Leonard Palin, testified (at a December 16, 1998 hearing) that B.V. contacted him from Warm Springs and instructed him to take A.M. to his parents' house, but B.V.'s mother refused to let him take the child.

¶15 B.V. testified that she had never neglected or abused A.M. She disputed evidence that she had attempted to plot the kidnaping of A.M. from the girl's foster home with the assistance of another boyfriend--with whom she had developed a relationship as "pen pals" while he was incarcerated in the state prison at Deer Lodge. Although she testified that she was more stable, diligently taking her medication, and taking parenting classes, she agreed that she still had episodes of explosive behavior, and that it was not in A.M.'s best interest to visit her if she was explosive or otherwise having problems with her mental health.

¶16 The court ordered that A.M. would remain in the Department's custody for the requested six months, and that B.V. could not contact the foster family, but could have supervised visits.

¶17 In November, the State petitioned the court for an additional six months temporary legal custody. A hearing was conducted on December 16, 1998, and in part focussed on the discontinuation of B.V.'s weekly visits with A.M. due to a reported "catastrophic response"[1] exhibited by A.M. which was attributed to the visits with B.V. In early December, a clinical psychologist specializing in childhood psychology, Dr. Ned Tranel, determined that upon examining A.M., B.V.'s records, and speaking with A.M.'s foster mother, the visits should stop at once and that it was the contact with B.V., and not the "institutional setting" at Warm Springs, that was the "triggering event" for A.M.'s stress

response.

¶18 Evidence and testimony at the December 16th hearing indicated that, according to the psychological evaluation conducted by Dr. Tranel in June of 1998, B.V. could "function effectively in a long-term, structured environment" and showed a "positive response to an inpatient treatment program." Nevertheless, she would have "little or no realistic expectation of providing minimal standards of parenting if left to her own resources." Dr. Tranel not only conducted an evaluation pursuant to this matter, but had also evaluated B. V. in 1997 prior to her arrest. That evaluation, according to Dr. Tranel, was directed at vocational training potential.

¶19 Dr. Tranel's testimony indicated that B.V. did not have "the capacity to meet a threshold level of parenting behavior for a young child" in the three critical areas of safety, nurturing and interpersonal relationships. The evidence revealed that B.V. had been hospitalized or institutionalized for psychiatric care approximately 20 times, had attempted suicide 23 times in the past--all prior to the birth of A.M. Dr. Tranel's report and testimony indicated that B.V. was not only bipolar--which feasibly could be maintained or kept in remission with medication--but also exhibited an array of symptoms associated with borderline personality disorder,[2] which is an "enduring trait" far less treatable through medication. He recommended that A.M.'s long-term care and needs be explored through "alternative placement." Under the circumstances, he would not recommend that B.V. be reunited with A.M. as a parent.

¶20 There was also ample evidence introduced that B.V. provided adequate care for A.M. until the fall of 1997 when she, admittedly, became "unstable" after discontinuing her medication. Written reports from regular health checkups indicate that A.M. was healthy, well-fed, and clean from shortly after birth in October of 1995 until October of 1997. Dr. Tranel's evaluation of A.M.'s medical records, in fact, indicated that "she has an age-appropriate developmental level in communication, in motor functions, and self-help skills, and in language functions."

¶21 Evidence and testimony also indicated that A.M.'s response to the visits as well as the mother-child interaction during the visits at Warm Springs were normal for a three-year-old child under the circumstances. The testimony of one expert for B.V., for example, directly contradicted the findings and recommendations made by Dr. Tranel. Dr. Debra Rainey, B.V.'s treating physician at Warm Springs, testified that she would recommend continued visitation between A.M. and B.V. and that the behavior she observed during A.

M.'s visits was "within the normal range of behavior of a child that age who's in foster care and separated from her mother." The testimony of A.M.'s foster mother, however, indicated that A.M.'s behavior changed dramatically after visits with B.V., and generally corroborated the expert testimony of Dr. Tranel.

¶22 B.V. testified that she understood going off of her medication prior to her arrest was a bad decision. She stated, however, that "taking away my daughter just because I am mentally ill--when people know that I can take care of her--that's not right."

¶23 On January 13, 1999, the District Court entered an order for the continuation of temporary legal custody and a second evaluation. The court once again made the determination that A.M. was a youth in need of care and that it would be in her best interest if temporary legal custody was granted to the Department for an additional six months.

¶24 The court also indicated that the question had been raised as to whether or not it was possible to formulate and implement an appropriate treatment plan. Thus, the court ordered that a second, neutral psychological evaluation of B.V. would be conducted, pursuant to § 41-3-609(4)(a), MCA (1997), to determine if B.V. "is capable of providing a safe and nurturing home for the youth within a reasonable time and if so recommend terms of an appropriate treatment plan including appropriate reunification and visitation conditions." The court suspended visitation between B.V. and A.M. "indefinitely."

¶25 Following the second evaluation ordered by the court, the State filed its petition for termination of parental rights on February 4, 1999. A hearing was set for April 28, 1999. Prior to the hearing, B.V. was released from Warm Springs, and relocated to Butte, Montana, and, as of August 11, 1999, was employed there.

¶26 The second court-ordered psychological evaluation, conducted by Dr. William Cook, corroborated much of B.V.'s history, and indicated that she had had "many incarcerations." He gave further detail of her three-year prison term in Oregon. Apparently, B.V. spent the first 18 months of her sentence in prison and was then transferred to a psychiatric facility to serve the remainder of her sentence. According to Dr. Cook's evaluation, B.V. was finally diagnosed as bipolar in 1992 while serving her sentence at the state hospital in Oregon.

¶27 The results of Dr. Cook's evaluation indicated that "[i]n addition to not considering all

of the aspects of a situation, and often misinterpreting what she does consider, she has difficulty stopping and thinking before making decisions, i.e., she tends to act impulsively on misinformation." The report indicated that B.V. was indeed afflicted with bipolar disorder and borderline personality disorder. Among the various characterizations, Dr. Cook indicated B.V. harbored an "extreme amount of anger," had few skills in "routine interactions with others," and tended toward "social isolation."

¶28 Dr. Cook concluded that "[n]o amount of outpatient supervision has been sufficient for [her] to manage her mental health thus far." Thus, "[g]iven the long history and chronic nature of her mental illness, with the accompanying suicide attempts, impulsive acting out, incarcerations and hospitalizations, it is unlikely that she could meet her child's needs in a reasonable amount of time."

¶29 Following the hearing, the District Court issued its Findings of Fact, Conclusions of Law and Decree on June 11, 1999. The court recounted testimony given at the hearing including that of Dr. Tranel, who testified that B.V.'s problems "are serious and chronic and that her odds of meeting minimal standards of care for [A.M.] are near zero." The court also found that although B.V. obviously "loves her daughter [A.M.] very much," in light of B.V.'s condition and the fact that A.M. was in her formative years and required stability and adequate parenting, "[c]ontinuation of the parent-child legal relationship will likely result in continued abuse or neglect." The court also observed that the testimony offered on B.V.'s behalf to rebut the testimony of doctors Tranel and Cook indicated that the evaluation conducted by a Dr. Bernard Peters was offered for the limited purpose of determining if B.V. qualified for social security income, and was inappropriate for custody evaluation.

¶30 The court concluded again that A.M. was a youth in need of care within the meaning of § 41-3-102, MCA (1997). The court also concluded that a treatment plan was waived pursuant to § 41-3-609(4)(a) and (b), MCA (1997), and that the conduct or condition of B.V. rendered her unfit, unable or unwilling to provide adequate parental care of A.M. and was unlikely to change within a reasonable amount of time. Further, the court concluded that B.V.'s "emotional illness, mental illness, or mental deficiency" was of such a duration and nature as to render her unlikely to care for the ongoing physical, mental, and emotional needs of A.M. within a reasonable time, under § 41-3-609(2)(a), MCA (1997).

¶31 The court ordered that the parent-child legal relationship between B.V. and A.M. was terminated in the best interest of A.M.

¶32 B.V. appealed.

## STANDARD OF REVIEW

¶33 We review a district court's findings of fact to determine whether the findings are clearly erroneous. *See In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *In re J.N.*, ¶ 11 (citations omitted). This Court reviews a district court's conclusions of law to determine whether the court interpreted the law correctly. *See In re J.N.*, ¶ 11 (citations omitted).

¶34 This Court has further stated that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, ¶ 12 (citations omitted). Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re J.N.*, ¶ 12 (citations omitted). Additionally, the party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *In re J.N.*, ¶ 12 (citations omitted).

## DISCUSSION

### *Issue 1.*

*Did the Department prove with clear and convincing evidence that A.M. was abused and neglected and was, thus, a youth in need of care so as to allow the termination of parental rights?*

¶35 B.V. argues that the District Court's initial determination that A.M. was a "youth in need of care" was made in error because there is insufficient evidence to demonstrate that at any time B.V. neglected or abused A.M. herself. B.V. also contends that being "in danger" of being abused and neglected does not satisfy the statutory criteria for the determination of a "youth in need of care." Underlying these contentions is her assertion that due to a statutory anomaly, the District Court applied a preponderance of the evidence standard where a "clear and convincing" standard is mandated by governing law.

¶36 The State contends that the Department was not required to show actual physical or emotional abuse in order to terminate parental rights, nor was it required to wait until A. M. was, in fact, harmed while in B.V.'s care, before instituting these proceedings. As for its evidentiary burden, the State contends that "there is no reason to suspect that Judge Mizner was unaware of that [clear and convincing] standard or did not correctly apply it in this case."

¶37 As a starting point, this Court is ever mindful of the declaration of policy that serves as a foundation for this State's child abuse and neglect statues; and that inherent in this policy is an often times dynamic tension between the need to "protect, whenever possible, family unity" and yet still "provide for the protection of children whose health and welfare are or *may be* adversely affected and *further threatened* by the conduct of those responsible for their care and protection." *See* § 41-3-101(1) through (4), MCA (1997) (emphasis added).[3] *See also In re J. L. B.* (1979), 182 Mont. 100, 109, 594 P.2d 1127, 1132 (recognizing that "family integrity" is a constitutionally protected interest and citing U.S. Supreme Court outline of constitutional interests under *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551); *In re B.P.*, 2000 MT 39, ¶ 37, 298 Mont. 287, ¶ 37, 995 P.2d 982, ¶ 37 (recognizing that the best interests of the children are paramount and take precedence over parental rights in child abuse and neglect proceedings) (citation omitted).

¶38 In furtherance of the foregoing policy, the "youth in need of care" statutes do not necessarily invoke the natural parent-child relationship, pursuant to § 41-3-102(22), MCA (defining "youth in need of care" as a youth who is abused or neglected). Rather, the determination here that A.M. was a youth in need of care in 1998, and at all times subsequent to that initial determination, turned on whether A.M. was or may be "abused and neglected" as defined under our child abuse and neglect statutes by any person responsible for her welfare, as defined under § 41-3-102(1), MCA (identifying parent, guardian, foster parent, adult residing in same home, day-care provider, and generally "any other person responsible for the child's welfare in a residential setting").

¶39 Under the foregoing criteria, the exigent protection of the health and welfare of the child is paramount where the State's initial intervention into otherwise private matters reveals an actual or potentially dangerous or unhealthy environment requiring the removal of the child from a custodial care giver. *See*, *e.g.*, *In re B.P.*, ¶ 37. Thus, the legal determination that a child is a youth in need of care is first and foremost a jurisdictional prerequisite for any court-ordered temporary transfer of custody. *See In re J.B.* (1996),

278 Mont. 160, 164, 923 P.2d 1096, 1099 (concluding that the district court failed to address any evidence of appellant's abuse or neglect of the child and therefore erred in granting temporary custody to the State).

¶40 The cases cited by B.V. for the proposition that she, herself, must have committed the abuse or neglect--meaning any abuse or neglect resulting from her mother's care of A.M. cannot be used against her for the purpose of terminating her parental rights--are distinguishable. In those cases the district courts made no findings at all of abuse or neglect--and instead relied wholly on a "best interest" standard for terminating the parent's rights. This Court determined that a reversal and remand was necessary. *See In re M.G.M.* (1982), 201 Mont. 400, 408, 654 P.2d 994, 998; *In re Guardianship of Doney* (1977), 174 Mont. 282, 286-87, 570 P.2d 575, 578 (reversing judgment of the district court, and returning custody of children to petitioner, where there was no showing that the children were abused or neglected).

¶41 Next, B.V.'s interpretation of what constitutes "abused and neglected" is misguided. As defined under § 41-3-102(2), MCA, the terms "abused and neglected" mean the state or condition of a child who has suffered child abuse or neglect. The terms "child abuse or neglect," however, include not only actual harm to a child's health or welfare, but also mean "threatened harm to a child's health or welfare." *See* § 41-3-102(6)(a)(i-ii), MCA. Under subpart (b), the terms "child abuse or neglect" expressly include "harm or *threatened harm* to a child's health or welfare by the acts or omissions of a person responsible for the child's welfare." (Emphasis added). Under § 41-3-102(9), MCA, "harm to a child's health or welfare" includes the harm that occurs whenever the parent *or other person responsible for the child's welfare*: "inflicts or allows to be inflicted upon the child physical or emotional abuse," or "exposes or allows the child to be exposed to an unreasonable risk to the child's health or welfare by failing to intervene or eliminate the risk," or otherwise fails to supply the child with "adequate food or fails to supply clothing, shelter, education, or adequate health care." (Emphasis added). Finally, "threatened harm" as used in the foregoing means a substantial risk of harm to the child's health or welfare. *See* § 41-3-102(19), MCA.

¶42 Contrary to B.V.'s argument, therefore, the statutes at issue here clearly provide that a child such as A.M. who, in the words of the District Court, is "in danger of being abused and neglected" may be deemed a youth in need of care irrespective of B.V.'s care for the child prior to her incarceration and placement in Warm Springs, or whether *actual* abuse or neglect occurred. *See In re M.M.* (1995), 274 Mont. 166, 170-71, 906 P.2d 675, 678

(children adjudicated youths in need of care due to mother leaving children with "inappropriate supervision"); *In re A.W.* (1991), 247 Mont. 268, 272-73, 806 P.2d 520, 523 (children adjudicated youths in need of care where mother continually exposed her children to a harmful living environment, although not committing abuse herself).

¶43 Here, we conclude that the evidence is more than clear and convincing that on January 30, 1998, the Department removed A.M. from an unhealthy, unsafe--not to mention abhorrent--living environment in B.V.'s own home, and that the court did not err each time it determined that, in the best interest of A.M., she should remain in foster care due to the fact that no alternative custody arrangement was immediately available within B.V.'s family. The substantial evidence relied on by the court clearly and convincingly indicates that throughout this ordeal, B.V. did not provide the Department with a viable alternative for the placement of A.M. other than with the foster home arranged by the Department. *See*, *e.g.*, § 41-3-406(1)(c)(iii), MCA (permitting transfer of temporary custody to a relative found by the court to be qualified to receive and care for the youth). It was from the hands of B.V.'s immediate family in Anaconda, in fact, that A.M. was initially removed. In turn, B.V. has offered little evidence to mitigate the causal relationship drawn by the State between her incarceration on December 23, 1997, and A.M.'s living condition discovered by the Department one month later. Although there is evidence that B.V. initiated consideration of other custody arrangements--*e.g.*, a boyfriend's family, her grandmother (A.M.'s great-grandmother) and a sister in Oregon--none proved sufficient to overcome the best interest of A.M. in remaining in the stable and safe foster home in which she was placed.

¶44 We agree with B.V. that in determining whether a child, such as A.M., is a youth in need of care, a court is required to apply only the "preponderance of the evidence standard." *See* § 41-3-404(1), MCA. Thus, B.V. is correct that the foregoing standard differs from the ultimate standard applied in parental termination cases as expressed in *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12 (party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met).

¶45 We further agree with B.V. that the State must prove by clear and convincing evidence the statutory criteria for terminating parental rights as set forth under § 41-3-609, MCA. Here, the termination was adjudicated pursuant to § 41-3-609(1)(e), MCA. The State must offer clear and convincing evidence that: (1) the child was adjudicated a youth in need of care; (2) an appropriate treatment plan approved by the court was complied

with by the parent or was not successful or that it was waived pursuant to § 41-3-609(4), MCA; and (3) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time.

¶46 We disagree, however, that the preponderance of evidence standard applied by a court pursuant to § 41-3-404(1), MCA, creates an "anomaly" in subsequent termination proceedings. Rather, the decisive first question is: does the record show that during the course of the parental rights termination proceedings the State offered clear and convincing evidence that the District Court correctly adjudicated A.M. a youth in need of care under the governing statutes? All that was required of the State, therefore, under § 41-3-609(1)(e), MCA, was an offer of clear and convincing evidence that the District Court had properly adjudicated A.M. as a youth in need of care as provided under the governing statutes--i.e., that the court had not exceeded its jurisdiction at any time in ordering the temporary transfer of A.M.'s custody until this matter could be further reviewed. With that question affirmatively satisfied, the District Court could then inquire into the actual fitness of the parent whose rights were at stake under § 41-3-609(1)(e), MCA.

¶47 Accordingly, we conclude that the State met its burden, and that the District Court did not err in its adjudication of A.M. as a youth in need of care for the ultimate purpose of terminating B.V.'s parental rights.

### Issue 2.

*Did the District Court violate B.V.'s due process rights by basing the termination of parental rights on the supposed adjudication of the child as a youth in need of care at an earlier hearing on a petition for temporary investigative authority where at the time of that hearing the parent was an indigent mental patient civilly committed to an institution and was then unrepresented by counsel?*

¶48 B.V. contends that the critical determination that A.M. was a youth in need of care pursuant to § 41-3-609(1)(e), MCA, was made by the District Court at a time when B.V. was not represented by counsel, which violated her due process rights. We find little merit in this argument.

¶49 The record indicates that at a February 18, 1998 show cause hearing pursuant to the State's petition for temporary investigative authority, B.V. appeared without representation of counsel. At a June 3, 1998 hearing, when the court considered the State's petition for

temporary legal custody, B.V. was represented by counsel--and would be for the remainder of these proceedings.

¶50 In *In re A.S.A.* (1993), 258 Mont. 194, 198, 852 P.2d 127, 130, this Court held that the due process clause in our State Constitution guarantees an indigent parent the right to court-appointed counsel in proceedings brought to terminate parental rights. To date, this Court has not extended this right to a pre-termination proceeding where the focal issue before the court is a determination of whether a child is a youth in need of care. *See In re D.S.* (1992), 253 Mont. 484, 488, 833 P.2d 1090, 1093 (State not required to provide counsel at temporary investigative authority proceeding, or at temporary custody hearing). Rather, appointment of counsel at any time prior to the initiation of parental rights termination proceedings is within the discretion of the district court. *See* § 41-3-401(12), MCA (court may at any time on its own motion or the motion of any party appoint a guardian ad litem for the youth or counsel for any indigent party). *See also In re M.F.* (1982), 201 Mont. 277, 283-86, 653 P.2d 1205, 1208-10 (citing three-part test for determining due process right to counsel from *Lassiter v. Department of Soc. Serv.* (1981), 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, and determining that State's interest in protecting the welfare of the children outweighed the parent's right to custody during initial investigatory proceedings where parent's rights could not be "erroneously stripped").

¶51 Further, B.V.'s argument that a court violates due process when it takes judicial notice of earlier proceedings wherein a parent is not represented by counsel has no application here. That rule, discussed in *In re M.F.*, refers to instances where a court takes judicial notice during the final custody proceedings of a report or other evidence submitted in an earlier custody proceeding--wherein a parent was unrepresented--without permitting the parent to then cross-examine the person supplying the report or evidence during the course of the termination proceedings. *See In re M.F.*, 201 Mont. at 286-87, 653 P.2d at 1210.

¶52 Here, the initial determination that A.M. was a youth in need of care, as discussed under *Issue 1.*, was one focussed entirely on the health and safety of the child under exigent circumstances, allowing the State to temporarily assume jurisdiction and transfer custody. *See In re J.B.*, 278 Mont. at 164, 923 P.2d at 1099. *See also* § 41-3-403(1)(c), MCA (providing that at the show cause hearing, the court shall provide an opportunity for a parent or guardian, if present, and any other person having relevant knowledge to provide relevant testimony, and may "limit testimony and evidence to only that which is relevant to the issues of removal from the home and the child's need for continued

protection").

¶53 The record indicates, in fact, that this initial determination was made even before B. V.'s first appearance at the February 18, 1998 hearing. A February 4, 1998 order found probable cause existed that A.M. was abused or neglected or in danger of being abused or neglected pursuant to § 41-3-102, MCA, and that the removal of A.M. from B.V.'s home was necessary in light of the need to protect A.M.'s welfare.

¶54 The initial determination by the District Court that A.M. was a youth in need of care relied on a report submitted by a social worker, Terri Waldorf. In turn, Terri Waldorf was subject to cross-examination by B.V.'s counsel at the June 3, 1998 hearing, and then at the December 16, 1998 hearing. Subsequent to the initial determination that A.M. was a youth in need of care, the court reached this same determination on at least three separate occasions--each at a time when B.V. was represented by counsel.

¶55 Accordingly, under our holdings in *In re D.S.* and *In re M.F.*, we hold that B.V.'s due process rights were not violated when the District Court initially determined that A.M. was a youth in need of care at a time when B.V. was not represented by counsel.

## *Issue 3.*

*Was sufficient evidence presented to terminate parental rights without a prior treatment plan under § 41-3-609(4)(a), MCA (1997)?*

¶56 B.V. argues that § 41-3-609(4)(a), MCA, does not apply to these proceedings because the required testimony of the two doctors was directly contradicted by two other doctors.

¶57 As indicated under *Issue 1.*, the requirement of a treatment plan under § 41-3-609(1) (e), MCA, may be waived pursuant to subsection (4)(a) upon a finding that "two medical doctors or clinical psychologists submit testimony that the parent cannot assume the role of parent."

¶58 The only rebuttal testimony to the evaluations conducted by doctors Tranel and Cook, was Dr. Debra Rainey,[4] B.V.'s treating physician at Warm Springs. Dr. Rainey testified at the December 1998 hearing that she reviewed Dr. Tranel's report and that she was familiar with B.V.'s psychiatric history. She did not, however, testify as to B.V.'s potential to assume the role of A.M.'s parent; rather, her testimony exclusively addressed the issue

of whether B.V. should be permitted to continue her weekly visits with A.M.

¶59 Thus, we disagree with B.V. that the testimony of doctors Tranel and Cook was "canceled" by the testimony of two other doctors concerning B.V.'s ability to assume the role of A.M.'s parent.

¶60 B.V. also contends that the testimony of doctors Tranel and Cook did not rule out the possibility that B.V. could parent. We disagree. Dr. Tranel's testimony indicated that B.V. did not have "the capacity to meet a threshold level of parenting behavior for a young child" in the three areas of safety, nurturing and interpersonal relationships. He recommended that A.M.'s long-term care and needs be explored through "alternative placement." Under the circumstances, he would not recommend that B.V. be reunited with A.M. as a parent. Dr. Cook reported that "[g]iven the long history and chronic nature of her mental illness, with the accompanying suicide attempts, impulsive acting out, incarcerations and hospitalizations, it is unlikely that she could meet her child's needs in a reasonable amount of time." He agreed that termination of B.V.'s parental rights was in A.M.'s best interest.

¶61 We conclude that the District Court did not abuse its discretion in finding that the testimony of Dr. Tranel and Dr. Cook clearly and convincingly established that B.V. could not, in their medical opinion, assume the role of parent pursuant to § 41-3-609(4)(a), MCA. Thus, we hold that the District Court did not err when it terminated B.V.'s parental rights under § 41-3-609(1)(e), MCA, without first requiring that an appropriate treatment plan be implemented.

## Issue 4.

*Did the District Court err in applying § 41-3-609(4)(b) (1997), which excuses the requirement of a treatment plan if the parent is incarcerated for more than one year?*

¶62 Having determined that the District Court did not err when in applied § 41-3-609(4)(a), MCA, and thereby waived the treatment plan requirement under § 41-3-609(1)(e), MCA, we need not address the issue of whether B.V. was incarcerated for more than one year and a treatment plan was not practical considering the incarceration, pursuant to § 41-3-609(4)(b).

## Issue 5.

*Did the termination of B.V.'s parental rights violate the Americans with Disabilities Act by imposing different standards for a parent with mental illness compared with standards imposed on other parents?*

¶63 B.V. argues that the application of §§ 41-3-609(1)(e) and 41-3-609(4)(a), MCA, to the factual circumstances set forth here violates the Americans With Disabilities Act (ADA) of 1990, under title 42 U.S.C. § 12101, *et seq.* (2000). B.V. contends that under the Act, a state government, including any department or agency, cannot subject a "qualified individual" to discrimination based on that individual's disability. *See* 42 U.S.C. § 12132 (2000).

¶64 The ADA is intended to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" to persons with disabilities. *See* 42 U.S. C. § 12101(a)(8) (2000). To achieve that goal, Title II of the ADA in 42 U.S.C. § 12132 (2000) provides, as pertinent here, that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

¶65 According to B.V., the foregoing Montana statutes, as applied to her, singled her out for termination of her parental rights under a different and substantially lower standard than those used for a non-disabled parent, in that actual "wrongful conduct" is required for all other parents.

¶66 While indicating that a majority of appellate courts have ruled that the ADA does not provide a defense to a parental termination proceeding--although this Court has not addressed the issue--the State contends that this Court should decline to undertake a first-impression review here because it was never presented to the District Court and has not been properly preserved for appeal.

¶67 B.V. counters the State's argument by asserting that the ADA issue was presented to the District Court in her proposed findings of fact, conclusions of law, and order which was submitted to the court following the April 28, 1999 hearing.

¶68 In *Nason v. `Leistiko*, 1998 MT 217, 290 Mont. 460, 963 P.2d 1279, we set forth the rule that where a party fails to (1) raise an issue in the pleadings, (2) does not present

argument on the issue during the hearing on the merits of the case, (3) does not move to amend the pleadings to conform to any evidence presented, and (4) raises the issue for the first time in a post-hearing memorandum which the district court does not address in its order, the issue has not been timely raised and may not be raised on appeal. *See Nason*, ¶ 18.

¶69 Applied to the case at bar, we observe that although no "pleadings," per se, are involved, B.V. nevertheless failed to interject the issue of her ADA defense at any time during the proceedings. Critically, she did not offer any testimony or evidence or argument at the various hearings that would support the legal conclusion regarding her ADA defense found in her proposed findings and conclusions.

¶70 We also observe that following the April 28, 1999 hearing, the court ordered the submission of proposed findings and conclusions, which B.V. submitted on May 25, 1999. The court did not address the post-hearing ADA defense in its final decree. Further, although B.V. moved for a new trial following the entry of the final decree on June 11, 1999, she did not then raise or address the ADA defense at that time.

¶71 Accordingly, we conclude that B.V.'s belated allusion to a possible ADA defense in her post-hearing proposed conclusions of law was untimely and did not preserve the issue for our review. *See Nason*, ¶ 18 (recognizing that when party "raises the issue for the first time in a post-hearing memorandum which the district court does not address in its order, the issue has not been timely raised and may not be raised on appeal"). We hold that B.V. failed to timely raise the ADA defense as an issue in the District Court and, therefore, cannot raise the issue on appeal.

¶72 Finding no abuse of discretion in the findings, and no incorrect conclusions of law, we affirm the Decree entered by the District Court terminating B.V.'s parental rights to A.M.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ PATRICIA COTTER

/S/ JIM RICE

## /S/ W. WILLIAM LEAPHART

1. Dr. Ned Tranel defined this term as a child who is "overwhelmed, flooded by, and unable to deal with or process the threatening events going on in the environment--the extreme precarious, fearful, frightening, overwhelming, catastrophic circumstances in the surrounding." As a result of such circumstances, according to Dr. Tranel, the child's behavior reflects a mixture of anger, fear, tearful resentment, crying, incontinence and sleep loss.

2. Dr. Tranel defined the term "borderline personality disorder" as an instability in "a variety of life functions," and is primarily characterized by "erratic, unpredictable . . . personal relationships--abrupt shifts from over idealizing to frantic or to hostile rejection" and "latching onto almost any reasonable prospect of a relationship because of intense fear of abandonment."

3. Unless otherwise indicated, all statutes referenced herein are those found under Montana's 1997 codes, which were in force at the time this matter was adjudicated by the District Court.

4. B.V. called Dr. Bernard Peters at the April 28, 1999 hearing to counter the opinions of Dr. Tranel and Dr. Cook. Dr. Peters testified, however, that "my evaluation was not done for the purpose of child custody" and clearly indicated that his evaluation was strictly for the purpose of determining the extent of B.V.'s disability for Social Security benefit eligibility.