DA 08-0448

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 225

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

RICHARD DWAYNE ROWE, JR.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADC 2008-18
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender; Roberta R. Zenker, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Sheri K. Sprigg, Assistant Attorney General, Helena, Montana

            Leo J. Gallagher, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs: May 28, 2009

Decided: June 30, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Richard Dwayne Rowe, Jr. (Rowe), appeals from an order of the First Judicial District Court, Lewis and Clark County, that imposed sentencing conditions limiting and supervising Rowe's contact with children under 15 years of age and requiring Rowe to register as a violent offender. We affirm in part and reverse in part.

¶2 Rowe presents the following issues for review:

¶3 Whether the District Court properly imposed a sentencing condition that required Rowe to have no contact with any person under the age of 15, unless accompanied by an approved adult.

¶4 Whether the District Court properly required Rowe to register as a violent offender.

## PROCEDURAL AND FACTUAL BACKGROUND

¶5 Cassandra Levengood (Cassandra) left her 2 year old son, A.S., in the care of her sister-in-law, Latasha Levengood (Latasha), on the afternoon of December 28, 2007. Cassandra worked evenings. Latasha provided primary child care to A.S. Latasha had cared for A.S. since he was three months old.

¶6 Cassandra knew of Latasha's friendship with Tara Weller (Weller). She also knew of Weller's methamphetamine use. Cassandra told Latasha that Weller could not be at Latasha's house when Latasha cared for A.S. Latasha had agreed.

¶7 Weller arrived at Latasha's trailer at approximately 5:30 p.m. on the evening of December 28, 2007. Weller asked Latasha if she wanted to go to dinner at Applebee's restaurant. Latasha decided that she would go with Weller. Weller and Latasha took A.S.

2

and Latasha's two daughters to Weller's trailer. They informed Weller's boyfriend, Rowe, that they needed a "girl's night out" and that he needed to watch the children. Unbeknownst to Cassandra, Latasha had allowed Rowe to care for A.S. approximately five times before this particular evening.

¶8 Rowe quickly became frustrated with A.S. A.S. was getting into everything. Rowe apparently attempted to call Weller and Latasha, but they would not answer their cell phones. Rowe lost his temper with A.S. Rowe threw A.S. against the wall and fractured the back of A.S.'s skull. Rowe picked up A.S. and shook him. Rowe also grabbed A.S. by the clothing and yanked him to his feet.

¶9 Rowe took the children to Latasha's trailer in the hope that Latasha's roommates would be there to watch them. Rowe pushed A.S. out the door as they walked out of Weller's trailer. A.S. struck his forehead on the top step and rolled down the rest of the steps. Rowe picked up A.S. and shook him. Rowe left the children with Latasha's roommates. Rowe noticed A.S. "spacing out" in a chair and throwing up as he left to return to Weller's trailer.

¶10 Weller received a call from Rowe while she and Latasha waited for their food. Rowe informed Weller that A.S. had fallen down the stairs and that Rowe needed them to come home. Weller and Latasha left Applebee's a few minutes before 7:00 p.m. They returned to Latasha's trailer and treated the contusion on A.S.'s forehead with an ice pack.

¶11 Latasha falsely informed Cassandra that A.S. had attempted to climb over a baby gate and started to fall. Latasha explained that she had slipped and fallen on A.S. when she

3

reached to catch him. Latasha claimed that A.S. had hit his head on the floor and had a "goose egg" on his forehead.

¶12 Cassandra called her boyfriend, James Meixner (Meixner), who picked up A.S. at Latasha's trailer at approximately 9:30 p.m. Meixner observed the bump on A.S.'s head. Meixner did not suspect a concussion or serious injury due to Latasha's explanation of how A.S. had been injured. Meixner took A.S. home and placed him in bed. Cassandra returned home and also observed the bump on A.S.'s head. A.S. did not sleep well that night. A.S. awoke every half-hour complaining that his head hurt.

¶13 Cassandra and Meixner noted the following morning that A.S. had severe bruising to his face and torso. Cassandra contacted her pediatrician, Karen E. Cody, M.D. (Dr. Cody). Dr. Cody examined A.S. Dr. Cody directed Cassandra to take A.S. to St. Peter's emergency room. Dr. Cody observed that the numerous injuries that A.S. had sustained were inconsistent with the explanation for how he had been injured.

¶14 The hospital staff discovered A.S.'s fractured skull. They discussed the possibility of air lifting him to Great Falls. The staff did not know whether A.S.'s brain was bleeding or swelling. The hospital staff reported A.S.'s injuries to law enforcement. Officer's learned in their investigation that A.S. had been in Latasha's care at the time that he had received his injuries.

¶15 Officers contacted Latasha and discovered that she had lied to Cassandra about how A.S. had sustained his injuries. Officers contacted Rowe. Rowe admitted to the officers that he had lied to Latasha about how A.S. had sustained his injuries. Rowe admitted to not

4

providing medical care to A.S. after seeing the injuries and knowing he had caused A.S. pain.

¶16 The State charged Rowe on January 11, 2008, with aggravated assault, a felony, in violation of § 45-5-202(1), MCA, and criminal endangerment, a felony, in violation of § 45-5-207, MCA. The State asserted that Rowe had satisfied the knowingly element of § 45-5-207, MCA, by being dishonest with the child's caretaker about the nature and the extent of the injuries to A.S. and for causing a delay in A.S. receiving medical attention.

¶17 Rowe eventually entered an agreement with the State whereby he entered "guilty" pleas to criminal endangerment, a felony, and negligent endangerment, a misdemeanor. The court accepted Rowe's pleas. The court ordered a pre-sentence investigation report (PSI) and scheduled sentencing. The State requested that Rowe's bond contain the condition that "he not be around children under age 15 without adult supervision." The State further requested that Weller, now Rowe's wife, could not provide the requisite adult supervision.

¶18 The court held Rowe's sentencing hearing on June 13, 2008. The court received the PSI, the mental health/psychosexual evaluation, and various letters submitted by the parties. The court also heard witness testimony. Dr. Cody submitted a letter to the court explaining that A.S.'s head injury had resulted in long term impairment. Dr. Cody asserted that A.S.'s future physical activities would have to exclude football, soccer, and any activity that could involve the possibility of additional head trauma. The court also heard testimony about how A.S. had suffered serious emotional and behavioral problems from this incident.

5

¶19 Melissa Lesmeister (Lesmeister) testified about the PSI that she and another probation officer had submitted to the court. She knew of Rowe's history from her previous work in mental health. Lesmeister testified that Rowe had a difficult childhood that included mental and physical abuse. She further testified that Rowe has had an ongoing anger problem. Lesmeister noted that anger had been mentioned in most of Rowe's diagnoses. Lesmeister also reviewed information from the Center for Mental Health in Helena regarding Rowe's therapy since his release from jail. Lesmeister testified that it appeared that Rowe was not willing to take responsibility for his actions.

¶20 Lesmeister knew of Rowe's recent marriage to Weller and his new baby at home. Lesmeister expressed concern about the infant's safety around Rowe. She opined that the frustration level that a new infant can bring into a home could manifest itself in another violent outburst by Rowe. Lesmeister determined that a "building of frustration" triggered Rowe's assault on A.S. Lesmeister recommended placement in a pre-release center that would allow Rowe parenting, anger management, supported living, the ability to gain part time employment, and the ability to start making consistent restitution payments. Lesmeister further recommended that a pre-release center would allow Rowe to be removed from a home where there would be an infant until he could gain more appropriate skills.

¶21 Cathleen Zanto (Zanto), Rowe's previous case manager, testified that pre-release would remove Rowe from his support system. She believed that the incident occurred due to Rowe voluntarily having stopped his medications approximately 2-3 weeks before the incident. Rowe convinced Zanto that he underestimated his need to continue with his

6

medications. She also testified to Rowe's commitment to improving his mental health and addressing his anger issues. Zanto had no concerns about Rowe being around his child. She believed that his support system, including herself and Weller's parents, would prevent Rowe from hurting his child. Zanto could not guarantee, however, that Rowe would not hurt his child.

¶22 Dean Gregg, Ph.D. (Dr. Gregg), performed a psychological evaluation on Rowe. He testified that Rowe had an average risk to re-offend. He further testified that Rowe's prognosis is "fair to good if he sticks with his treatment, classes that type of thing." He also testified, however, that Rowe did not understand the seriousness of his crimes. He initially informed the court that he would defer to the Department of Child and Family Services regarding whether Rowe should be able to parent his child. He later cautioned the court about allowing Rowe around small children.

¶23 The court committed Rowe for felony criminal endangerment to the Department of Corrections (DOC) for ten years, with five years suspended. The court sentenced Rowe for misdemeanor negligent endangerment to the Lewis and Clark County jail for one year, with all time suspended, and to run concurrently with the sentence imposed for the criminal endangerment conviction. The court authorized the DOC to place Rowe into an appropriate community-based program, facility, or State correctional institution. The court recommended that he complete a pre-release center program.

¶24 The court imposed a number of conditions. The two conditions pertinent to this appeal are: 1) "the defendant shall have no contact with any individual under the age of

7

fifteen (15) unless accompanied by an approved adult who is aware of the defendant's conviction and who is approved by his supervising officer and therapist," and 2) "the defendant shall register as a violent offender, pursuant to Section 46-23-504, and shall advise law enforcement of his current address." Rowe appeals.

## STANDARD OF REVIEW

¶25 We review de novo the legality of a sentencing condition. *State v. Corbin*, 2008 MT 146, ¶ 4, 343 Mont. 211, 184 P.3d 287. We review the reasonableness of the challenged condition to determine whether the sentencing court abused its discretion. *Corbin*, ¶ 4.

## DISCUSSION

¶26 *Whether the District Court properly imposed a sentencing condition that required Rowe to have no contact with any person under the age of 15, unless accompanied by an approved adult.*

¶27 Weller had been pregnant with Rowe's child at the time that he attacked A.S. Rowe and Weller married on March 6, 2008. Weller gave birth to their child the week of the sentencing hearing. Much of the sentencing hearing pertained to Rowe's contact with his newborn baby.

¶28 Rowe argues that this sentencing condition effectively deprives him of his fundamental right to parent his own child. Rowe cites to *Matter of A.S.A.*, 258 Mont. 194, 197, 852 P.2d 127, 129 (1993), to argue that a natural parent's right to the care and custody of his or her child is a "fundamental liberty interest." Rowe argues that the record fails to support a compelling state interest that outweighs his fundamental right to parent his own

8

child. Rowe contends that he completed parenting classes before the time of sentencing and that he had been enrolled in anger management classes, coping skills classes, and a CP&R class. Rowe points out that his child was not the victim in this case. Rowe argues that the circumstances surrounding his own child differ vastly from those of the victim, thus diminishing any reasonable necessity to infringe upon his constitutional right to parent his child. Rowe points to Zanto's testimony that she had counseled him for four years and that she had no concerns about him being near his own child.

¶29 The child abuse and neglect statutes reflect the "tension between the need to 'protect, whenever possible, family unity' and yet still 'provide for the protection of children whose health and welfare are or *may be* adversely affected and *further threatened* by the conduct of those responsible for their care and protection.'" *In re A.M.*, 2001 MT 60, ¶ 37, 304 Mont. 379, 22 P.3d 185. Section 41-3-102(2), MCA, provides that a *parent* is "a person responsible for a child's welfare." A "substantial risk of physical or psychological harm to a child by the acts or omissions of a person responsible for the child's welfare" constitutes child abuse and neglect. Section 41-3-102(7)(a)(ii) and (b)(i)(A), MCA; *see In re J.A.B.*, 1999 MT 173, ¶ 10, 295 Mont. 227, 983 P.2d 387. Threatened harm to a child's health or welfare means substantial risk of harm to the child's health or welfare. *J.A.B.*, ¶ 10.

¶30 Rowe participated in anger management for several years before the commission of these crimes. Rowe voluntarily stopped taking his medications 2-3 weeks before this incident. Zanto opines that the incident occurred *because* Rowe had been off his medications. Rowe has committed other incidents of violence, however, in addition to his

attack on A.S. It is undisputed that Rowe has an anger problem. Rowe poses a substantial risk of harm to his child. *J.A.B.*, ¶ 10. The District Court did not abuse its discretion when it imposed this sentencing condition. *Corbin*, ¶ 4.

¶31 *Whether the District Court properly required Rowe to register as a violent offender.*

¶32 Rowe pled guilty to felony criminal endangerment and misdemeanor negligent endangerment. The court imposed the sentencing condition that Rowe register as a violent offender pursuant to § 46-23-504, MCA. The State concedes, however, that this sentencing condition exceeded the court's statutory authority.

¶33 Section 46-23-502(10), MCA, provides that a violent offender is a person who has been convicted of a violent offense. A violent offender status is determined purely by statute. *State v. Miller*, 1998 MT 177, ¶ 41, 290 Mont. 97, 966 P.2d 721. Section 46-23-502(13)(a), MCA, lists the "violent offenses" that require registration. Rowe's offenses are not included. The District Court lacked any statutory authority to require Rowe to register as a violent offender.

¶34 We affirm in part, reverse in part, and remand for entry of an amended sentence consistent with this Opinion.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

10

/S/ PATRICIA COTTER